UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> CHARLES J. DEMARCO, M.D., DELTA DIAGNOSTIC RADIOLOGY, P.C., AVALON RADIOLOGY, P.C., EDWARD GORSHTEIN, LEONID SHUSTERMAN, AKKORD MANAGING SERVICES, INC., AND BIG APPLE MANAGING SERVICES. INC., <br><br> Defendants. | C.A. No. |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

I.     **INTRODUCTION**

1.     This action involves numerous individuals and entities that have banded together to defraud Allstate and to exploit both New York and federal law through (a) the unlawful management and control of two purportedly physician-owned professional corporations, and (b)

1

the submission to Allstate of hundreds of fraudulent charges for diagnostic radiology services—i.e., magnetic resonance imaging ("MRI") studies.  These diagnostic radiology services were purportedly provided to individuals involved in automobile accidents who were eligible for coverage under an insurance policy issued by Allstate ("Insureds").

2.      Defendants, Delta Diagnostic Radiology, P.C. ("Delta") and Avalon Radiology P.C. ("Avalon") (collectively, "PC Defendants"), were purposely used as the vehicles through which the defendants submitted the fraudulent claims.  As explained below, Delta and Avalon are not—and, in fact, have never been—eligible to seek or recover No-Fault reimbursement payments from Allstate because:

a)      The PC Defendants are unlawfully owned and controlled by one or more non-physician;

b)      The PC Defendants billed Allstate for diagnostic radiology services that were performed by independent contractors and not persons actually employed by the PC Defendants;

c)      The purported sole officer, director, and shareholder of the PC Defendants, Charles J. DeMarco, M.D. ("DeMarco"), does not actually practice medicine through either Delta or Avalon; and

d)      The PC Defendants were purposely and knowingly caused to unlawfully split the PC Defendants' professional fees and profits with one or more non-physician.

3.      The PC Defendants were also purposely and knowingly caused to seek reimbursement from Allstate in connection with claims that were non-compensable under

2

prevailing New York law because the underlying diagnostic radiology services were not lawfully rendered and/or were of no medical or diagnostic value.

4.     At all relevant times, defendants Edward Gorshtein ("Gorshtein"), Leonid Shusterman ("Shusterman"), Akkord Managing Services, Inc. ("Akkord"), and Big Apple Managing Services, Inc. ("Big Apple") (collectively, "Management Defendants")—none of whom are licensed physicians or are lawfully authorized to control, manage, or share in the professional fees and profits of physician-owned professional corporations—purposely and knowingly conspired with DeMarco to unlawfully operate Delta and Avalon in direct violation of prevailing New York and federal law.

5.     At all relevant times and as a key part of this scheme, DeMarco purported to serve as the sole officer, director, and shareholder of Delta and Avalon. In reality, however, the Management Defendants actually managed and controlled the PC Defendants, and used a series of arrangements with DeMarco and the PC Defendants to unlawfully channel the professional fees and profits of Delta and Avalon to themselves.

6.     As detailed below, the Management Defendants schemed to defraud Allstate by:

a)     Causing DeMarco to incorporate the PC Defendants although DeMarco did not practice medicine through either Delta or Avalon;

b)     Requiring DeMarco to enter into a series of one-sided arrangements governing the operation and management of the PC Defendants by the Management Defendants, including those governing the use of space and MRI equipment;

c)     Exerting control over the day-to-day operation and management of Delta and Avalon;

d)      Hiring independent contractors to perform diagnostic radiology services, and then purposely and intentionally causing the PC Defendants to seek reimbursement for such services as if the services had been provided by an owner or employee of the PC Defendants;

e)      Using the façade of the PC Defendants and their connections with Akkord and Big Apple to purposely and knowingly conceal the truth that the PC Defendants were unlawfully controlled by the Management Defendants;

f)      Causing the PC Defendants to bill Allstate for reimbursement on assigned No-Fault claims even though the PC Defendants were never legally entitled to pursue, collect, or retain such reimbursement; and

g)      Causing the PC Defendants to bill Allstate for diagnostic radiology services that were non-compensable because they were not lawfully rendered, if at all.

7.      As detailed below, the PC Defendants never had any right to be compensated for any of the billed-for services purportedly provided to Allstate Insureds.

8.      As a result of the defendants' fraudulent scheme, Allstate has been damaged in excess of $2,509,527.00, representing "No-Fault" insurance payments that Allstate was wrongly induced to make in connection with the PC Defendants' reimbursement demands.

9.      This action seeks the recovery of all such monies that Allstate was wrongfully induced to pay to the PC Defendants.

10.     This action also seeks a declaration that Allstate is not legally obligated to pay any and all previously-denied and/or currently unpaid claims submitted by (or on behalf of) the PC Defendants because the services purportedly rendered to Allstate Insureds were rendered in direct violation of one or more New York State licensing requirements necessary to provide such

services, thus rendering the PC Defendants completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

11.     Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted hundreds of bills for health care services purportedly rendered to persons eligible for insurance coverage under Allstate insurance policies.

12.     By this Complaint, Allstate brings this action against the above-captioned defendants for:  (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; (c) unjust enrichment; and (d) declaratory relief.

13.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

14.     The defendants' insurance fraud scheme was purposely designed and executed to elicit payment of automobile insurance contract proceeds from Allstate to the defendants.

15.     In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which defendants perpetrated their scheme to defraud.

16.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

## II.     THE PARTIES

### A.     PLAINTIFFS

17.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle

& Property Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal places of business in Northbrook, Illinois.

18.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company were each authorized to conduct business in New York.

### B.     DEFENDANTS

19.     DeMarco is a physician who has been licensed to practice medicine in New York since 1989.

20.     DeMarco resides in and is a citizen of the State of New York.

21.     Delta is a New York professional service corporation with its principal place of business located at 61 Avenue U, Brooklyn, New York.

22.     Delta also purports to operate out of an office space located at 275 Avenue X, Brooklyn, New York.

23.     At all relevant times, DeMarco falsely purported to be the sole officer, director, and shareholder of Delta.

24.     At all relevant times, and in direct violation of N.Y. Bus. Corp. Law § 1508, Delta was unlawfully operated and controlled by one or more non-physician, and was therefore ineligible to collect payments pursuant to N.Y. Ins. Law § 5102.

25.     Avalon is a New York professional service corporation with its principal place of business located at 2085 West 11th Street, Brooklyn, New York.

26.     From at least 2012 through the present, DeMarco falsely purported to be the sole officer, director, and shareholder of Avalon.

27.     From at least 2012 to the present, and in direct violation of N.Y. Bus. Corp. Law § 1508, Avalon was unlawfully operated and controlled by one or more non-licensed layperson, and was therefore ineligible to collect payments pursuant to N.Y. Ins. Law § 5102.

28.     Gorshtein resides in and is a citizen of New York.

29.     Gorshtein has never been licensed to provide professional health care services.

30.     Shusterman resides in and is a citizen of Pennsylvania.

31.     Shusterman has never been licensed to provide professional health care services.

32.     Big Apple is a domestic business corporation with a principal place of business at 275 Avenue X, 2nd Floor, Brooklyn, NY.

33.     Gorshtein is registered as the CEO of Big Apple.

34.     During the relevant period, Gorshtein and Shusterman knowingly used Big Apple to unlawfully operate one or more of the PC Defendants and to unlawfully share in the professional physician fess and profits collected by the PC Defendants.

35.     Akkord is a domestic business corporation with a principal place of business at 61 Avenue U, Brooklyn, New York.

36.     Both Gorshtein and Shusterman are executive officers of Akkord.

37.     During the relevant period, Gorshtein and Shusterman purposely used Akkord to unlawfully operate one or more of the PC Defendants and to unlawfully share in the professional physician fees and profits collected by the PC Defendants.

III.    **JURISDICTION AND VENUE**

38.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

7

39.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

40.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

41.     At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws (as detailed *infra*).

42.     The defendants' activities in and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

43.     As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

## IV.   APPLICABLE LAWS AND REGULATIONS

### A.     NEW YORK'S NO-FAULT LAWS AND RELEVANT LICENSING PROVISIONS

44.     Allstate underwrites automobile insurance in the State of New York.

45.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

46.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11

N.Y.C.R.R. § 65, *et seq.*) (collectively, "the No-Fault Law"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter "No-Fault Benefits") to Allstate claimants.

47.     Under the New York No-Fault Law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

48.     "Basic economic loss" is defined to include "all necessary expenses" for medical services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

49.     No-Fault Benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary health care goods and services.

50.     A patient can assign his/her No-Fault Benefits to health care service providers.

51.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

52.     Pursuant to N.Y. Ins. Law § 403(d), NF-3s must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime…

53.     NF-3 forms are important documents in the insurance industry.  They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

9

54.     It is a material misrepresentation to submit NF-3 forms for treatment, testing, and other services that: (a) are never provided; or (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided.

55.     In New York, only a licensed physician may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable in this case—economic benefit from physician services.

56.     New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

57.     New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

58.     New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation."  It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

59.     Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

10

60.     Under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

61.     Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

62.     In New York, insurers may seek affirmative recovery against individuals and entities that have violated the above statutes and regulations.

63.     In *State Farm v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional health care services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional health care services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

64.     In the matter *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term 2d Dep't 2006), it was held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

11

65.     As detailed below, the defendants purposely and knowingly violated one or more of the above-cited New York statutes and regulations through the operation and management of Delta and Avalon.

**B.    THE WORKERS' COMPENSATION FEE SCHEDULE AND RADIOLOGY GROUND RULES**

66.     To regulate the fees charged by health care providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

67.     The Fee Schedule is used by health care providers and insurers to determine the level of reimbursement payable on legitimate claims.

68.     Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for…medical…surgical…physical therapy…[and] any other professional health services."

69.     In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

70.     Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault Laws] and the workers' compensation law with respect to the charges for the professional health services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

71.     The Fee Schedule regarding radiology services sets forth specific ground rules that health care providers are required to follow when seeking reimbursement from insurers for such services.

12

72.     The Fee Schedule, Ground Rule 6, entitled "Specific Billing Instructions," states that the "listed values are for the technical component plus the professional component" of the services and indicates that "total reimbursement for the professional and technical components shall not exceed the listed value for the total procedure, regardless of sites where the services are rendered."

73.     Ground Rule 6 defines the "professional component" as the value of the professional radiological services provided by the physician, including reading the film and preparing a report.  Ground Rule 6 further defines the "technical component" as the charges for the performance of the actual procedure (i.e., the actual scan using the MRI equipment).

74.     Within the radiology section of the Fee Schedule, each Current Procedure Terminology ("CPT") code allocates a certain percentage of each service to the technical component and a certain percentage to the professional component.

75.     For example, if a health care provider were to bill an insurer for performing a lumbar MRI using CPT code 72148, twenty percent (20%) of the charges would be allocated to the professional component and eighty percent (80%) of the charges would be allocated to the technical component.

76.     If that health care provider resided in Region 4 (where Delta and Avalon purported to render radiology services), and billed for the performance of a lumbar MRI at $912.00 (per the Fee Schedule), only $182.40 of the charge would be reimbursable for services rendered by the physician (i.e., the professional component).  The remaining 80% ($729.60) would be reimbursable to the individual or entity that performed the technical component.

77.     At all relevant times, the PC Defendants routinely, purposely, and knowingly billed Allstate for the professional component and the technical component of the MRI services

purportedly provided even though no owner or employee or Delta or Avalon played any role in the actual taking of the MRI image (i.e., the technical component).

## V.       FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

78.     New York's No-Fault system is designed to provide patients and health care providers with compensation for the provision of health care services, and is also designed to require prompt payment of patient claims.

79.     As a result, the submission of bills by health care service providers for facially-valid services often will result in prompt payment from a No-Fault insurer.

80.     However, New York's No-Fault laws and enacting regulations are clear that providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet *any* New York State or local licensing requirement necessary to perform such service in New York.

81.     As explained below, at all relevant times, the defendants have taken advantage of New York's No-Fault system by (a) operating the PC Defendants in violation of one or more applicable New York state licensing requirements governing the provision of professional health care services, and (b) in certain instances, creating and submitting (or causing to be created and submitted) to Allstate false and fraudulent reports and invoices demanding payment pursuant to New York's No-Fault laws.

82.     The defendants, at all times relevant, knew that (a) the PC Defendants were actually controlled by one or more non-physician, and (b) the PC Defendants were caused to unlawfully split professional physician fees and profits with one or more non-physician.

83.     The Management Defendants' control over the PC Defendants compromised patient care, as the provision of health care services by the PC Defendants was subject to the pecuniary interests of one or more non-physician.

84.     The defendants, at all relevant times, also knew that the bills submitted to Allstate were non-compensable because the underlying MRI services were not lawfully rendered, if at all, in accordance with the standard of care.

85.     The defendants' purported provision of MRI services to Allstate insureds jeopardized patient health and safety, as the results of such MRI services were used to guide the course of patient treatment.

86.     Further, the defendants, at all relevant times, knew that the bills submitted to Allstate were non-compensable because: (a) the sole physician-owner of the PC Defendants, DeMarco, did not actually practice medicine through either Delta or Avalon; and (b) the radiology services were performed by independent contractors.

87.     Because the PC Defendants were (a) unlawfully operated and controlled by one or more non-physician; and (b) used as a conduit to unlawfully split fees with one or more non-physician, the PC Defendants were operated in violation of New York law, thus rendering both Delta and Avalon completely ineligible for No-Fault reimbursement under Insurance Law § 5102(a)(1).

88.     To commence this scheme, Gorshtein and Shusterman purposely and knowingly conspired with DeMarco to have DeMarco—albeit facially—act as the sole officer, director, and shareholder of Delta.

89.     DeMarco was the perfect figurehead for this scheme because he had been subject to professional discipline in New York and New Jersey, thus limiting his prospects for legitimate employment.  *See* DeMarco Disciplinary Records, attached as Exhibit 1.

90.     Once formed with DeMarco as the nominal physician-owner, Delta was purposely and knowingly used as a conduit to collect No-Fault benefits for health care services purportedly rendered through Delta, even though Delta was, in reality, controlled by one or more non-physician.

91.     Throughout the course of this scheme, control of Delta has been ceded unlawfully to the Management Defendants, who used the façade of Delta to do indirectly what they were forbidden from doing directly, namely: (a) controlling physician-owned professional corporations; and (b) charging for (and deriving an economic benefit from) the purported provision of physician services.

92.     As a means to further this scheme, in 2012, Gorshtein and Shusterman further conspired with DeMarco to have DeMarco to incorporate and serve as the nominal physician-owner of another professional corporation—Avalon.

93.     To create the false appearance that Avalon was a separate and distinct entity, the defendants simply set up Avalon on the other side of the building where Delta maintained its operation.

94.     The defendants then purposely and knowingly used Avalon as another means to collect No-Fault benefits for health care services purportedly rendered through Avalon, even though Avalon was, in reality, controlled by one or more non-physician.

95.     From its inception, control of Avalon has been ceded unlawfully to the Management Defendants, who used the façade of Avalon to do indirectly what they were

forbidden from doing directly, namely: (a) controlling the practices of a licensed physician; and (b) charging for (and deriving an economic benefit from) DeMarco's purported provision of physician services.

96.    As part of the scheme, DeMarco permitted Gorshtein and Shusterman, acting through Big Apple and Akkord, to exercise dominion and control over the PC Defendants, including Delta's and Avalon's No-Fault receivables.

97.    DeMarco also allowed Gorshtein and Shusterman, acting through Big Apple and Akkord, to administer the day-to-day operation, management, and/or control of Delta and Avalon.

### A.    THE UNLAWFUL OPERATION AND CONTROL OF DELTA AND AVALON

98.    Once DeMarco agreed to organize Delta, Gorshtein and Shusterman caused DeMarco, on behalf of Delta, to enter into a series of arrangements with Big Apple, and later with Akkord.

99.    These arrangements caused Delta to pay exorbitant sums in purported "rent" and other expenses to the Management Defendants for the use of space and equipment, including an MRI machine.

100.    The MRI machine used by Delta and Avalon at the 61 Avenue U/2085 West 11th Street facility (i.e., Hitachi MRP 5000 scanner), however, is obsolete and incapable of producing scans of any medical or diagnostic value.

101.    The Hitachi MRP 5000 scanner, which has not been manufactured since 1994, has a ten year life span and cannot be upgraded.

102.    In 2004, toward the end of the unit's life, the Hitachi MRP 5000 scanner only had an actual market value of no more than $12,000.00 to $60,000.00.

103.    Because MRI equipment depreciates significantly with each year of successive use, virtually any amount in monthly "rent" charged by the Management Defendants for Delta's "use" of the Hitachi MRP 5000 scanner was excessive, as the equipment was utterly worthless and of no diagnostic utility.

104.    Upon information and belief, Delta was also obligated to pay the Management Defendants grossly excessive fees for a number of other services, including administrative services, personnel, technicians, and billing and collections services.

105.    The amounts charged by the Management Defendants for these services far exceeds any reasonable market value, and the amounts charged were simply used as means to mask the fact that the Management Defendants were unlawfully siphoning the professional physician fees and profits from Delta.

106.    To further their scheme, the Management Defendants also used certain arrangements to exert unlawful control over Avalon.

107.    In addition to these arrangements, the Management Defendants selected a location conducive to furthering this scheme.

108.    To conceal their conduct and to further their scheme, the defendants intentionally manipulated the addresses of Delta and Avalon to purposely and knowingly create the false appearance that Delta and Avalon were wholly separate entities that operated from different locations.

109.    Specifically, Delta was caused to operate from the 61 Avenue U, Brooklyn, New York location even though Delta's public filings with the State of New York indicate that Delta's principal place of operation was at 275 Avenue X, Brooklyn, New York—a location with no known diagnostic radiology equipment, including an MRI scanner..

110.    Delta's use of the Avenue U facility is significant because the MRI machine used at the 61 Avenue U location is utterly obsolete and incapable of producing images of any diagnostic value.

111.    Notably, Delta has been caused to continually operate from the 61 Avenue U location, and at all times, has used this obsolete MRI equipment to provide radiology services to Allstate Insureds.

112.    To further their scheme, defendants later caused the creation of Avalon.

113.    While Avalon continued to use the same obsolete MRI equipment, the defendants took purposeful steps to conceal this fact by listing Avalon's registered address with the NYS Department of State and Office of the Professions as 2085 West 11th Street, Brooklyn, New York—a street address that appears unrelated, but in reality, is simply located on the west side of the building located at 61 Avenue U.

114.    The defendants also took purposeful steps to create the illusion that the PC Defendants and the Management Defendants' entities (i.e., Big Apple and Akkord) were separate and distinct entities with different places of business.

115.    First, Big Apple was caused to register its corporate address as 275 Avenue X, 2nd Floor, Brooklyn, New York 11223.

116.    Notably, while Delta's public filings made it seem that Delta was associated only with the 275 Avenue X address, no such diagnostic imaging services were conducted at this address—all such services were actually rendered at the 61 Avenue U location.

117.    Further, although Akkord's New York State Department of State Service of Process address is listed as 61 Avenue U, Unit A, Brooklyn, New York 11223, Delta's bills routinely represent its service address as 61 Avenue U, Unit B, Brooklyn, New York 11223.

118.    Notably, there are no separate "units" at the 61 Avenue U location, and defendants' representations regarding where Akkord and Delta conducted business were intended solely to create the illusion that Delta and Akkord did not share the same physical space—which they have throughout the course of this scheme.

119.    Additionally, before being taken out of service, the telephone numbers for both Akkord and Delta differed by only one digit, and when called in a consecutive manner, the same individual answered both lines with the same non-specific greeting" "MRI, can I help you?"

120.    As a further part of this scheme, the defendants conspired to falsely represent to Allstate that DeMarco performed the physical MRI scans and interpreted the films for virtually every single claim.

121.    DeMarco, however, did not actually perform each of the services for which the PC Defendants billed; rather, such services, in many instances, were performed by independent contractors rather than an owner or employee of Delta or Avalon.

122.    DeMarco rarely visits the 61 Avenue U/2085 West 11th Street facility, thus rendering false the representations that DeMarco actually provided the diagnostic imaging services for which Allstate was billed.

123.    Because DeMarco rarely, if ever, was actually present at the 61 Avenue U/2085 West 11th Street facility, it was utterly impossible for DeMarco to hire, supervise, and/or train the persons who actually provided the imaging services to Allstate Insureds.

124.    Moreover, because most of Delta's and Avalon's reports and invoices bear DeMarco's electronic signature or stamp, it is questionable whether DeMarco ever actually reviewed or signed the reports and invoices.

125.     In fact, some of the documentation submitted to Allstate by Delta and/or Avalon simply contains no form of signature whatsoever.

126.     DeMarco's purposeful and knowing decision to relinquish control of the PC Defendants to one or more non-physicians caused both Delta and Avalon to be operated in direct violation of one or more state law or regulation pertaining to the operation of a physician-owned professional corporation, thus rendering both Delta and Avalon completely ineligible for reimbursement under New York's No-Fault law.

**B.     DEMARCO'S FAILURE TO ENGAGE IN THE PRACTICE OF MEDICINE THROUGH DELTA AND AVALON**

127.     Business Corporation Law § 1507 requires a shareholder physician of a medical corporation to actually be engaged in the practice of medicine through the professional corporation.

128.     DeMarco never significantly engaged in the practice of medicine through either of the PC Defendants.

129.     As part of this scheme, DeMarco simply served as nominal owner of Delta and Avalon.

130.     DeMarco played little-to-no role in the services purportedly provided through Delta and Avalon, and was rarely physically present at the 61 Avenue U/2085 West 11th Street facility, thus making it impossible for DeMarco to adequately supervise the provision of medical services purportedly provided to Delta and/or Avalon patients.

131.     Despite his virtual absence, DeMarco is listed on a multitude of bills and MRI reports submitted to Allstate as the individual who physically performed the MRI scans (i.e., the technical component) and who interpreted the film (i.e., the professional component).

132. Numerous bills submitted by the PC Defendants to Allstate for reimbursement were not was actually signed by DeMarco.

133. Likewise, most, if not all, of the assignment of benefit forms relating to the health care services purportedly provided by the PC Defendants did not bear DeMarco's actual signature.

134. Rather, these forms bear only DeMarco's electronic signature, which was likely placed on the forms by the Management Defendants or persons under their control.

135. DeMarco's limited participation in the PC Defendants' operation establishes that DeMarco was not engaged in the practice of medicine through Delta or Avalon as required by New York Law. New York Business Corporation Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation.

136. Prevailing New York law is clear that a professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued… All shares issued, agreements made, or proxies granted in violation of this section shall be void.

137. The statute's legislative history confirms that the physician must not only be licensed to practice, but must also be engaged in the practice of medicine in a medical professional corporation.

138. For example, the New York State Education Department stated on June 15, 1971 in its recommendation regarding the amendment to the Business Corporation Law (S 5399-C):

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations. While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

139.   Similarly, the New York Department of State commented in a letter dated June 24, 1971 to Counsel to the Governor regarding the bill amending the Business Corporation Law (S 5399-C) that:

> Section 1507 currently limits issuance of shares in such a corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity. The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

140.   New York's Department of Health was of the same opinion in a letter dated June 24, 1971 to Counsel to the Governor regarding S 5399-C, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged.

141.   Further, while N.Y. Educ. Law § 6521 defines the practice of medicine as "diagnosing…any human disease, pain, injury, deformity or physical  condition," the MRI machine purportedly used by DeMarco in the purported treatment of Delta and Avalon patients, as detailed above, is wholly incapable of producing scans of any diagnostic or medical utility.

142.   Overall, the actual operation of Delta and Avalon make clear that DeMarco played no meaningful role, if any, in the day-to-day operation of Delta and Avalon at their actual places of business at the 61 Avenue U/2085 West 11th Street location.

23

143.     DeMarco's failure to engage in the practice of medicine through Delta or Avalon—as well as his failure to supervise any technicians or other individuals who perform services on behalf of Delta or Avalon—compromised patient care and resulted in unnecessary and/or worthless diagnostic testing.

144.     Whereas both Delta's and Avalon's operation were always subject to the pecuniary interests of one or more non-physicians, and not the independent medical judgment of a licensed doctor, both Delta and Avalon lacked reimbursement eligibility under New York's No-Fault laws.

## VI.    UNLAWFUL BILLING FOR SERVICES RENDERED BY INDEPENDENT CONTRACTORS

145.     To be eligible for reimbursement under the No-Fault Laws, a professional corporation is entitled to payment from an insurer only if, *inter alia*, the professional corporation—through an owner or employee thereof—is the actual provider of the billed-for services.

146.     A health care provider's use of independent contractors, rather than employees, to provide health services renders the provider ineligible to receive reimbursement under the No-Fault Laws. *See* DOI Opinion Letter, dated February 21, 2001, attached hereto as Exhibit 2.

147.     Throughout the scheme, the bills submitted by Delta and Avalon include charges for services provided by independent contractors.

148.     On virtually every assignment of benefits form, MRI interpretive report, and bill submitted by Delta and Avalon to Allstate, DeMarco is identified as both the individual who rendered the radiology services and the individual who reviewed and interpreted the radiology films.

149.    In reality, however, the persons who actually administered the scans (i.e., the technical component of the scans) were not employed by Delta or Avalon.

150.    Thus, even assuming that DeMarco happened to interpret the scans at an off-site location (i.e., the professional component), neither Delta nor Avalon was permitted to charge for the technical component of the services as if DeMarco or a Delta/Avalon employee had performed the service.

151.    The technicians—who are not actually employed by Delta, Avalon, or DeMarco—render the technical component of the radiology services, and then electronically transmit the information and results to DeMarco at his home or office.

152.    Because the technical component of these services was rendered by independent contractors, neither Delta nor Avalon was ever the direct provider of the health care services that were billed to Allstate.

153.    Accordingly, in all such instances, Delta and Avalon were completely ineligible to receive reimbursement for those billed-for services under New York's No-Fault laws.

## VII.   THE DEFENDANTS' PROVISION OF AND BILLING FOR FRAUDULENT MRI SERVICES

154.    As stated above, the MRI testing provided by the defendants through the PC Defendants was fraudulent and non-compensable under New York's No-Fault Laws because the equipment used to conduct the tests—the Hitachi MRP 5000—is outdated and incapable of producing scans of any diagnostic quality.

155.    Specifically, the Hitachi MRP 5000 machine used by Delta and Avalon at the 61 Avenue U/2085 West 11th Street facility was manufactured in 1994, and has a lifespan of ten (10) years, at most.

156.    While some MRI machines are capable of being ungraded to a current production model, the Hitachi MRP 5000 is not.

157.    Thus, for the Hitachi MRP 5000 located at the 61 Avenue U/2085 West 11th Street facility to be used in any meaningful or functional diagnostic capacity, the entire magnet would have to be replaced.

158.    However, upon information and belief, the magnet housed in the Hitachi MRP 5000 machine at the 61 Avenue U/2085 West 11th Street facility has never been replaced at any time during the course of this scheme.

159.    Thus, the MRI machine used to test Delta and Avalon patients was essentially rendered obsolete in or around 2004, and, as of today, has no place in patient care or the performance of legitimate diagnostic testing services.

160.    Further, the quality of the images produced by the defendants' Hitachi MRP 5000 machine are worthless and of no diagnostic utility.

161.    In fact, the images captured by this obsolete machine often contain a tremendous amount of "artifacts"—objects which appear in a scanned image that are not actually present in the original image.

162.    The presence of these artifacts results in a worthless image wholly devoid of any diagnostic quality

163.    Thus, the continued use of this obsolete machine resulted in MRI services that were grossly below the standard of care, while also compromising patient health and safety.

164.    Accordingly, in every case where this obsolete machine was used, the resulting image was of no diagnostic value, and each of Delta's and Avalon's charges based on the use of

this arcane machinery render each such charge non-compensable under New York's No-Fault Laws.

## VIII.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

165.    Throughout the course of this entire scheme, DeMarco, Gorshtein, and Shusterman created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

166.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

167.    Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

### A.    DELTA ENTERPRISE

168.    DeMarco, Gorshtein, and Shusterman either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Delta to be mailed to

27

Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

169.    DeMarco, Gorshtein, and Shusterman caused Delta to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time Delta mailed a demand for payment (i.e., invoice) to Allstate.

170.    Gorshtein's and Shusterman's management and control of Delta, combined with Gorshtein's and Shusterman's unlawful receipt of Delta's professional physician fees and profits, rendered Delta completely ineligible for No-Fault reimbursement under New York law.

171.    Because Delta was, in fact, unlawfully controlled by Gorshtein and Shusterman (both non-physicians), DeMarco, Gorshtein, and Shusterman purposely caused Delta to make a misrepresentation each and every time Delta mailed a document to Allstate claiming eligibility for reimbursement.

172.    Moreover, because (a) Gorshtein and Shusterman unlawfully controlled Delta, (b) DeMarco, Gorshtein, and Shusterman caused Delta to seek No-Fault reimbursement from Allstate (even though Delta was not lawfully entitled to such reimbursement), and (c) Delta used the U.S. Mail to seek reimbursement, it is clear that DeMarco, Gorshtein, and Shusterman committed mail fraud.

173.    At all relevant times, DeMarco, Gorshtein, and Shusterman knew that Delta, Gorshtein's and Shusterman's management companies (i.e., Big Apple and Akkord), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by Delta.

28

174.    Allstate estimates that the unlawful operation of the Delta enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 3 and incorporated herein by reference as if set forth in its entirety.

**B.    AVALON ENTERPRISE**

175.    DeMarco, Gorshtein, and Shusterman either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Avalon to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

176.    DeMarco, Gorshtein, and Shusterman caused Avalon to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time Avalon mailed a demand for payment (i.e., invoice) to Allstate.

177.    Gorshtein's and Shusterman's management and control of Avalon, combined with Gorshtein's and Shusterman's unlawful receipt of Avalon's professional physician fees and profits, rendered Avalon completely ineligible for No-Fault reimbursement under New York law.

178.    Because Avalon was, in fact, unlawfully controlled by Gorshtein and Shusterman (both non-physicians), DeMarco, Gorshtein, and Shusterman purposely caused Avalon to make a misrepresentation each and every time Avalon mailed a document to Allstate claiming eligibility for reimbursement.

179.    Moreover, because (a) Gorshtein and Shusterman unlawfully controlled Avalon, (b) DeMarco, Gorshtein, and Shusterman caused Avalon to seek No-Fault reimbursement from Allstate (even though Avalon was not lawfully entitled to such reimbursement), and (c) Avalon

used the U.S. Mail to seek reimbursement, it is clear that DeMarco, Gorshtein, and Shusterman committed mail fraud.

180.    At all relevant times, DeMarco, Gorshtein, and Shusterman knew that Avalon, Gorshtein's and Shusterman's management companies (i.e., Big Apple and Akkord), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by Avalon.

181.    Allstate estimates that the unlawful operation of the Avalon enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 4 and incorporated herein by reference as if set forth in its entirety.

## IX.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.    FRAUDULENT CONCEALMENT OF GORSHTEIN'S AND SHUSTERMAN'S UNLAWFUL CONTROL OF THE DELTA ENTERPRISE

182.    Gorshtein and Shusterman induced DeMarco to register himself with the State of New York as Delta's sole officer, director, and shareholder.

183.    The documents created and filed with the State of New York related to Delta deliberately omitted any reference to Gorshtein's and Shusterman's or their management companies' involvement with DeMarco or Delta.

184.    The documents created and filed with the State of New York related to Delta gave no indication to Allstate or the general public that Gorshtein and/or Shusterman in any way maintained a controlling interest in Delta.

185.    Based on the representations contained within the four corners of the documents filed with State of New York on behalf of Delta, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Gorshtein's and Shusterman's domination of and control over DeMarco and Delta.

186.    Gorshtein's, Shusterman's, and DeMarco's purposeful concealment of Gorshtein's and Shusterman's controlling interest in Delta allowed Gorshtein and Shusterman to unlawfully control Delta undetected.

187.    At all relevant times during the operation of the Delta enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Delta, Gorshtein, Shusterman, and DeMarco caused Delta to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

188.    Through their role as the owners/operators of Big Apple and Akkord, Gorshtein and Shusterman directly participated in the operation and control of Delta, and thus caused Delta to falsely claim eligibility for No-Fault reimbursement.

189.    Further, DeMarco attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Delta patients, as well as the validity of the charges for such services.

190.    At all relevant times, DeMarco, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

191.    At all relevant times, Gorshtein, Shusterman, and DeMarco actively concealed from Allstate facts regarding Delta's true ownership and control to prevent Allstate from

discovering that Delta was unlawfully incorporated, owned, and controlled by non-physicians, and therefore ineligible to bill for or collect No-Fault benefits.

192.    Many of these facts—particularly Delta's unlawful splitting of professional physician fees and profits with Gorshtein, Shusterman, Big Apple, and Akkord—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

193.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

194.    Thus, every time Gorshtein, Shusterman, and DeMarco (along with those individuals working under their control) caused Delta to submit No-Fault reimbursement demands to Allstate, Gorshtein, Shusterman, and DeMarco (and those individuals working under their control) necessarily certified that Delta was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

195.    The full extent of Gorshtein's, Shusterman's, and DeMarco's fraudulent and unlawful acts relative to their control over the Delta enterprise—including (a) Gorshtein's and Shusterman's involvement in the operation and control of Delta, and (b) the unlawful channeling of Delta's professional proceeds to Gorshtein and Shusterman through the agreements that Big Apple and Akkord maintained with DeMarco and Delta was not, and could not have been, known to Allstate until it commenced this action.

B.   **FRAUDULENT CONCEALMENT OF GORSHTEIN'S AND SHUSTERMAN'S UNLAWFUL CONTROL OF THE AVALON ENTERPRISE**

196.   Gorshtein and Shusterman induced DeMarco to register himself with the State of New York as Avalon's sole officer, director, and shareholder.

197.   The documents created and filed with the State of New York related to Avalon deliberately omitted any reference to Gorshtein's and Shusterman's or their management company's (i.e., Akkord) involvement with DeMarco or Avalon.

198.   The documents created and filed with the State of New York related to Avalon gave no indication to Allstate or the general public that Gorshtein and/or Shusterman in any way maintained a controlling interest in Avalon.

199.   Based on the representations contained within the four corners of the documents filed with State of New York on behalf of Avalon, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Gorshtein's and Shusterman's domination of and control over DeMarco and Avalon.

200.   Gorshtein's, Shusterman's, and DeMarco's purposeful concealment of Gorshtein's and Shusterman's controlling interest in Avalon allowed Gorshtein and Shusterman to unlawfully control Avalon undetected.

201.   At all relevant times during the operation of the Avalon enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Avalon, Gorshtein, Shusterman, and DeMarco caused Avalon to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

202.   Through their role as the owners/operators of Akkord, Gorshtein and Shusterman directly participated in the operation and control of Avalon, and thus caused Avalon to falsely claim eligibility for No-Fault reimbursement.

33

203. Further, DeMarco attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Avalon patients, as well as the validity of the charges for such services.

204. At all relevant times, DeMarco, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

205. At all relevant times, Gorshtein, Shusterman, and DeMarco actively concealed from Allstate facts regarding Avalon's true ownership and control to prevent Allstate from discovering that Avalon was unlawfully incorporated, owned, and controlled by non-physicians, and therefore ineligible to bill for or collect No-Fault benefits.

206. Many of these facts—particularly Avalon's unlawful splitting of professional physician fees and profits with Gorshtein, Shusterman, and Akkord—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

207. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

208. Thus, every time Gorshtein, Shusterman, and DeMarco (along with those individuals working under their control) caused Avalon to submit No-Fault reimbursement demands to Allstate, Gorshtein, Shusterman, and DeMarco (and those individuals working under their control) necessarily certified that Avalon was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

209.    The full extent of Gorshtein's, Shusterman's, and DeMarco's fraudulent and unlawful acts relative to their control over the Avalon enterprise—including (a) Gorshtein's and Shusterman's involvement in the operation and control of Avalon, and (b) the unlawful channeling of Avalon's professional proceeds to Gorshtein and Shusterman through the agreements that Akkord maintained with DeMarco and Avalon was not, and could not have been, known to Allstate until it commenced this action.

C.    **ALLSTATE'S JUSTIFIABLE RELIANCE**

210.    Each claim submitted to Allstate by (or on behalf of) Delta and Avalon was verified pursuant to Insurance Law § 403.

211.    At all relevant times, DeMarco, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

212.    To induce Allstate to promptly pay Delta's and Avalon's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or other invoices certifying that Delta and Avalon were eligible to be reimbursed under New York's No-Fault Laws.

213.    Further, to induce Allstate to promptly pay the fraudulent charges for the diagnostic imaging services purportedly provided to patients of Delta and Avalon, the defendants hired law firms to pursue collection of the fraudulent charges from Allstate.  These law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Delta's and Avalon's charges are not promptly paid in full.

214.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate in

support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

215.   At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Delta's and Avalon's reimbursement eligibility under New York law.

216.   In reasonable reliance on these misrepresentations, Allstate paid money to Delta and Avalon to its detriment.

217.   Allstate would not have paid these monies had the defendants provided true and accurate information about Delta's and Avalon's reimbursement eligibility under New York law, including the fact and necessity of the services provided.

218.   As a result, Allstate has paid in excess of $2,509,527.00 in reasonable reliance on the defendants' false medical documentation and false representations regarding Delta's and Avalon's eligibility for reimbursement under New York's No-Fault Laws.

## X.   DAMAGES

219.   The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments made in connection with first-party ("No-Fault") claims in excess of $2,509,527.00, the exact amount to be determined at trial.   The tables annexed at Exhibits 5 and 6, and incorporated herein as if set forth in their entirety, identify Allstate's payments to Delta and Avalon in connection with first-party ("No-Fault") claims determined to be fraudulent as of the filing of this Complaint.

## XI.  CAUSES OF ACTION

### COUNT I
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.)**

220.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

221.     Defendants, Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc. (collectively "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

222.     The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart, annexed hereto as Exhibit 3.

223.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

224.     Policies of insurance were delivered to insureds through the U.S. Mail.

225.     Medical reports and invoices were delivered to Allstate through the U.S. Mail.

226.     Payments made by Allstate to Delta Diagnostic Radiology, P.C. traveled via the U.S. Mail.

227.     As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Delta Diagnostic Radiology, P.C. to collect payment

from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

228.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Delta Diagnostic Radiology, P.C. for the benefit of the Count I Defendants that it would not otherwise have paid.

229.    The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

230.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

231.    By filing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

232.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Delta Diagnostic Radiology, P.C. for the benefit of the Count I Defendants.

233.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

234.    Delta Diagnostic Radiology, P.C. constitutes an enterprise engaged in, and the activities of which affects interstate commerce.

235.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

236.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

237.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

238.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each defendant identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

<u>COUNT II</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.)**

239.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

240.    Defendants Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc. (collectively "Count II Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Delta Diagnostic Radiology, P.C.

241.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Delta Diagnostic Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in

Exhibit 3, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

242.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Delta Diagnostic Radiology, P.C., even though Delta Diagnostic Radiology, P.C., as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such payments.

243.   The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

244.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of Delta Diagnostic Radiology, P.C. in connection with radiology services that were never actually rendered, or whose results were intentionally manipulated and/or fabricated by the Count II Defendants.

245.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

246.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT III</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**AVALON RADIOLOGY, P.C. ENTERPRISE**
**(Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord**
**Managing Services, Inc.)**

247.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

248.   Defendants, Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc. (collectively "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

249.   The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart, annexed hereto as Exhibit 4.

250.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

251.   Policies of insurance were delivered to insureds through the U.S. Mail.

252.   Medical reports and invoices were delivered to Allstate through the U.S. Mail.

253.   Payments made by Allstate to Avalon Radiology, P.C. traveled via the U.S. Mail.

254.   As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Avalon Radiology, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

255.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Avalon Radiology, P.C. for the benefit of the Count III Defendants that would not otherwise have been paid.

256.   The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

257.   The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

258.   By filing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

259.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Avalon Radiology, P.C. for the benefit of the Count III Defendants.

260.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

261.   Avalon Radiology, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

262. The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

263.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

264.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

265.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each defendant identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**AVALON RADIOLOGY, P.C. ENTERPRISE**
**(Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc.)**

266.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

267.    Defendants Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc. (collectively "Count IV Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Avalon Radiology, P.C.

268.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Avalon Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 4, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

269.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Avalon Radiology, P.C., even though Avalon Radiology, P.C., as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such payments.

270. The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

271. The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of Avalon Radiology, P.C. in connection with radiology services that were never actually rendered, or whose results were intentionally manipulated and/or fabricated by the Count IV Defendants.

272. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

273. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### AKKORD MANAGING SERVICES, INC. ENTERPRISE
### (Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C. Edward Gorshtein, and Leonid Shusterman)

274. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

275. Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C., Edward Gorshtein, and Leonid Shusterman, (collectively "Count V

Defendants"), intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

276.     The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts annexed hereto as Exhibit 4.

277.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

278.     Policies of insurance were delivered to insureds through the U.S. Mail.

279.     Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

280.     As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

281.     The Count V Defendants' use of Akkord Managing Services, Inc. to siphon the professional physician fees and profits from Delta Diagnostic Radiology, P.C. and from Avalon Radiology, P.C. for Gorshtein's and Shusteran's own personal use and financial gain is/was unlawful.

282.     The use of Akkord Managing Services, Inc. also allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., and further permitted Gorshtein and Shusterman to

share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

283.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. for the benefit of the Count V Defendants that would not otherwise have been paid.

284.     The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

285.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

286.     By filing numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

287.     The activities in this case had the direct effect of causing funds to be transferred from Allstate to Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. and then to Akkord Managing Services, Inc. for the benefit of Edward Gorshtein and Leonid Shusterman.

288.     Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

289.     Akkord Managing Services, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

290.    The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

291.    Allstate is a "person" a defined by 18 U.S.C. § 1962(c), injured in its business or property by reason of the Count V Defendants' conduct.

292.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

293.    By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**AKKORD MANAGING SERVICES, INC. ENTERPRISE**
**(Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C.,**
**Edward Gorshtein, and Leonid Shusterman)**

294.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

295.    Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C., Edward Gorshtein, and Leonid Shusterman, (collectively "Count VI" Defendants) conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

296.    The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts

of mail fraud as set forth in Exhibit 3 and 4, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

297.    The Count VI Defendants' use of Akkord Managing Services, Inc. to funnel professional physician fees and profits from Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to Gorshtein and Shusterman was unlawful, and allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., and further permitted Gorshtein and Shusterman to share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

298.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., even though Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., as a result of the defendants' unlawful conduct, were not eligible to collect such No-Fault payments.

299.    The purpose of this conspiracy was also to cause monies collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to be funneled to Akkord Managing Services, P.C. for the benefit of Edward Gorshtein and Leonid Shusterman.  The funneling of monies to Edward Gorshtein and Leonid Shusterman in this manner was unlawful, and allowed Edward Gorshtein and Leonid Shusterman to exercise some degree of control over the operation and management of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., and further permitted Edward Gorshtein and Leonid Shusterman to share in the professional fees collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

300.     The Count VI Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objections, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

301.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

302.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to collect from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BIG APPLE MANAGING SERVICES, INC. ENTERPRISE**
**(Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and Leonid Shusterman)**

303.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

304.     Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and Leonid Shusterman (collectively "Count VII Defendants"), intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

305.     The Count VII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart annexed hereto as Exhibit 3 and 4.

306.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

307.     Policies of insurance were delivered to insureds through the U.S. Mail.

308.     Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

309.     As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Delta Diagnostic Radiology, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

310.     The Count VII Defendants' use of Big Apple Managing Services, Inc. to siphon the professional physician fees and profits from Delta Diagnostic Radiology, P.C. for Gorshtein's and Shusterman's own personal use and financial gain is/was unlawful.

311.     The use of Big Apple Managing Services, Inc. also allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C., and further permitted Gorshtein and Shusterman to share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C.

312.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Delta Diagnostic Radiology, P.C. for the benefit of the Count VII Defendants that would not otherwise have been paid.

313.    The Count VII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

314.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

315.    By filing numerous fraudulent claims in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

316.    The activities in this case had the direct effect of causing funds to be transferred from Allstate to Delta Diagnostic Radiology, P.C. and then to Big Apple Managing Services, Inc. for the benefit of Edward Gorshtein and Leonid Shusterman.

317.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

318.    Big Apple Managing Services, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

319.    The Count VII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

320.    Allstate is a "person" a defined by 18 U.S.C. § 1962(c), injured in its business or property by reason of the Count VII Defendants' conduct.

321.    The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

322.    By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**BIG APPLE MANAGING SERVICES, INC. ENTERPRISE**
**(Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and Leonid Shusterman)**

323.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

324.    Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and Leonid Shusterman (collectively "Count VIII" Defendants) conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

325.    The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Delta Diagnostic Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 3 and 4, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

326.    The Count VIII Defendants' use of Big Apple Managing Services, Inc. to funnel professional physician fees and profits from Delta Diagnostic Radiology, P.C. to Gorshtein and Shusterman was unlawful, and allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C., and further permitted Gorshtein

and Shusterman to share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C.

327.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Delta Diagnostic Radiology, P.C., even though Delta Diagnostic Radiology, P.C., as a result of the defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

328.    The purpose of this conspiracy was also to cause monies collected by Delta Diagnostic Radiology, P.C. to be funneled to Big Apple Managing Services, P.C. for the benefit of Gorshtein and Shusterman.  The funneling of monies to Gorshtein and Shusterman in this manner was unlawful, and allowed Gorshtein and Shusterman to exercise some degree of control over the operation and management of Delta Diagnostic Radiology, P.C., and further permitted Gorshtein and Shusterman to share in the professional fees collected by Delta Diagnostic Radiology, P.C.

329.    The Count VIII Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objections, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

330.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

331.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to collect from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
## COMMON-LAW FRAUD
### (Against All Defendants)

332.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

333.     The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. each was entitled to receive No-Fault reimbursement under New York law.

334.     The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices, and collection documentation.

335.     The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

336.     The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.—professional health care entities that were operated and controlled in direct violation of New York law—for payment of No-Fault insurance benefits.

337.     The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

338.     Allstate reasonably relied, it its detriment, upon the defendants' material misrepresentations concerning Delta Diagnostic Radiology, P.C.'s and Avalon Radiology, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for medical expenses pursuant to No-Fault insurance claims.

339.   Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.—in excess of $2,509,527.00—for health care expenses and services rendered to Allstate claimants, even though Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. were, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT X**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

340.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

341.   When Allstate paid Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., it reasonably believed that Allstate was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

342.   Allstate's payments constitute a benefit that the defendants aggressively sought and voluntarily accepted.

343.   At all relevant times, the defendants caused Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to wrongfully obtain payments from Allstate—in excess of $2,509,527.00—through their fraudulent billing scheme as described more fully in the paragraphs above.

344.   Retention of these benefits would violate fundamental principles of justice, equity and good conscience.

## COUNT XI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Delta Diagnostic Radiology, P.C.)

345.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

346.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide health care services in New York.

347.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.), and (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.), Delta Diagnostic Radiology, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional health care services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

348.    Delta Diagnostic Radiology, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

349.    Delta Diagnostic Radiology, P.C. continues to challenge Allstate's prior claim denials.

350.    Delta Diagnostic Radiology, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

351.    A justifiable controversy exists between Allstate and Delta Diagnostic Radiology, P.C. because Delta Diagnostic Radiology, P.C. rejects Allstate's ability to deny such claims.

352.    Allstate has no adequate remedy at law.

353.    Delta Diagnostic Radiology, P.C. will also continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Delta Diagnostic Radiology, P.C.

354.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, §§ 2201 and 2202, declaring that Delta Diagnostic Radiology, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physicians, and (c) engaged in the unlawful sharing of fees derived from the provision of physician services, and thus has no standing to submit or receive assigned No-Fault benefits.

### COUNT XII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Avalon Radiology, P.C.)

355.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

356.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide health care services in New York.

357.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc.), and (c) unlawful sharing of professional physician fees with one or more non-physician

(i.e., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc.), Avalon Radiology, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional health care services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

358.    Avalon Radiology, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

359.    Avalon Radiology, P.C. continues to challenge Allstate's prior claim denials.

360.    Avalon Radiology, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

361.    A justifiable controversy exists between Allstate and Avalon Radiology, P.C. because Avalon Radiology, P.C. rejects Allstate's ability to deny such claims.

362.    Allstate has no adequate remedy at law.

363.    Avalon Radiology, P.C. will also continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Avalon Radiology, P.C.

364.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, §§ 2201 and 2202, declaring that Avalon Radiology, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physicians, and (c) engaged in the unlawful sharing of fees derived from the provision of physician services, and thus has no standing to submit or receive assigned No-Fault benefits.

## XII.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company, (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Violations of 18 U.S.C. § 1962(c))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

**COUNT II**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Violations of 18 U.S.C. § 1962(d))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

**COUNT III**
**AVALON RADIOLOGY, P.C. ENTERPRISE**
**(Violations of 18 U.S.C. § 1962(c))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT IV
### AVALON RADIOLOGY, P.C. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(d))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT V
### AKKORD MANAGING SERVICES, INC. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(c))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT VI
### AKKORD MANAGING SERVICES, INC. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(d))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT VII
### BIG APPLE MANAGING SERVICES, INC. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(c))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT VIII
## BIG APPLE MANAGING SERVICES, INC. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(d))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT IX
### (Common-Law Fraud)

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct; and

(c)     AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just and appropriate.

## COUNT X
### (Unjust Enrichment)

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just and appropriate.

## COUNT XI
### (Declaratory Relief)

(a)     DECLARE that Delta Diagnostic Radiology, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and as a result, has been operated in violation of at least one New York State and/or local licensing requirement necessary to provide professional medical services in New York;

(b)     DECLARE that Delta Diagnostic Radiology, P.C.'s activities are unlawful;

(c)     DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Delta Diagnostic Radiology, P.C.; and

(d)     GRANT all other relief this Court deems just and appropriate.

## COUNT XII
### (Declaratory Relief)

(a)     DECLARE that Avalon Radiology, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and as a result, has been operated in violation of at least one New York State and/or local licensing requirement necessary to provide professional medical services in New York;

(b)     DECLARE that Avalon Radiology, P.C.'s activities are unlawful;

(c)     DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Avalon Radiology, P.C.; and

(d)     GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbtink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
Shauna L. Sullivan (SS5624)
ssullivan@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
1325 Franklin Ave., Suite 320
Garden City, NY 11530
(347) 710-0050 (phone)

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company, and Allstate*
*Vehicle & Property Insurance Company*

Dated:  August 5, 2015