UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————————— X

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, ALLSTATE
FIRE & CASUALTY INSURANCE COMPANY, AND
ALLSTATE VEHICLE AND PROPERTY INSURANCE          Docket No.: CV No.
COMPANY                                          1: 15- cv-04561-ERK-LB

                                                      MEMORANDUM
                                                        OF LAW

        -against-

CHARLES J. DEMARCO, M.D.
DELTA DIAGNOSTIC RADIOLOGY, P.C.
AVALON RADIOLOGY, P.C.
EDWARD GORSHTEIN
LEONID SHUSTERMAN
AKKORD MANAGING SERVICES, INC. and
BIG APPLE MANAGING SERVICES, INC.
                                          Defendant(s)
———————————————————————————— X


MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS THE PLAINTIFFS' COMPLAINT PURSUANT TO F.R.C.P. 12(C)

                    By: DAVID O'COONOR, ESQ.
                        Attorney for Defendants CHARLES
                        DEMARCO, M.D., DELTA DIAGNOSTIC
                        RADIOLOGY and AVALON RADIOLOGY
                        807 Kings Highway, 2nd Floor
                        Brooklyn, NY 11223
                        (718) 517-2322

TABLE OF CONTENTS

PRELIMINARY STATEMENT......................................................................1

STATEMENT OF THE FACTS...................................................................1

ANALYSIS SUMMARY..........................................................................4

ARGUMENTS

POINT I      THE COURT SHOULD DISMISS PLAINTIFFS NON-MALELLA
             CLAIMS IN THEIR ENTIRETY SINCE NO-FAULT INSURERS
             HAVE THIRTYDAYS TO EITHER PAY OR DENY A NO-FAULT
             CLAIM..........................................................................9

POINT II     PLAINTIFF'S NON-MALELLA CLAIMS ARE BARRED BY THE
             EQUITABLE DOCTRINE OF LATCHES..................................19

POINT III    THE COURT MUST DISMISS PLAINTIFF'S ELEVENTH AND
             TWELFTH CAUSE OF ACTION AGAINST DEFENDANTS DELTA
             AND AVALON FOR A DECLARATORY JUDGMENT UNDER 28
             U.S.C. §2201.................................................................21

POINT IV     THE COURT MUST DISMISS PLAINTIFF'S RICO CLAIMS AGAINST
             THE DEMARCO DEFENDANTS..............................................24

POINT V      THE COURT MUST DISMISS PLAINTIFF'S MALELLA RELATED
             FRAUD CLAIMS AGAINST THE DEMARCO DEFENDANTS SINCE
             THEY FAIL TO STATE A CLAIM UNDER RULE 9(b) or 8(a)............28

POINT VI     PARTIAL SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56(C)
             IS APPROPRIATE SINCE THE PLAINTIFFS' WILL BE UNABLE TO
             ESTABLISH THAT THE EQUIPMENT USED BY THE DEFENDANTS
             IS OBSOLETE DUE TO BEING OUTDATED AND INCAPABLE OF
             BEING UPGRADED..........................................................44

POINT VII    THERE IS NO JUSTICABLE CONTROVERSY BEFORE THE COURT
             AND, THEREFORE, NO SUBJECT MATTER JURISDICTION..........45

POINT VIII   LACKING ORIGINAL JURISDICTION, THE COURT SHOULD
             REFUSE TO EXERCISE SUPPLEMENTAL JURISDICTION..........46

## PRELIMINARY STATEMENT

Charles Demarco, M.D., Delta Diagnostic Radiology, P.C. and Avalon

Radiology, P.C. (hereinafter the "Demarco Defendants") submit this Memorandum of

Law in support of their motion to dismiss Plaintiffs' complaint as against them.

## STATEMENT OF THE FACTS

1)      The defendant Charles Demarco, M.D., is a licensed physician in the State of
New York.

2)      The defendant Delta Diagnostic Radiology, P.C. is a domestic corporation that
provides diagnostic medical services, is owned by Dr. Demarco and was incorporated by
him in 2001.

3)      The defendant Avalon Radiology, P.C. is a domestic corporation that provides
diagnostic medical services, is owned by Dr. Demarco and was incorporated by him in
2012.

4)      Upon information and belief, the defendant Akkord Managing Services, Inc.,
(Hereinafter "Akkord") is a domestic corporation authorized to do business in the State of
New York.

5)      Upon information and belief, the defendant Edward Gorshtein is the owner of
Akkord.

6)      Upon information and belief, defendant Big Apple Managing Services, Inc.,
(Hereinafter "Big Apple") is a domestic corporation authorized to do business in the State
of New York

7)      Upon information and belief, defendant Leonid Shusterman is the owner of Big
Apple.

8)      During the time frame in the plaintiffs' complaint, Dr. Demarco was the sole
owner and operator of both Delta Diagnostic Radiology, P.C. and Avalon Radiology,
P.C. (Hereinafter "Delta" and "Avalon" respectively).

9)      On August 5, 2015, the plaintiffs' commenced the within action against the
Demarco defendants (Exhibit A)

10)     On October 12, 2015, the Demearco Defendants filed their answer.

1

11)     The action is based upon Dr. Demarco's alleged participation in the alleged
fraudulent incorporation of Delta and Avalon as well as the improper billing of no-fault
claims for the purposes of defrauding the plaintiff Allstate Insurance. Complaint ¶2-6, 86,
87. The plaintiffs also seek a declaration that Demarco Defendants are not entitled to
collect payment for No-Fault services which it has submitted to the Plaintiffs and which
have not been paid. Complaint ¶10.

12)     The complaint sets forth a general narrative set on conclusions and then asserts
each count without reference to a specific set of facts upon which it is founded.  The
complaint fails to set forth the required particularity for any of the alleged fraud and also
fails to set forth the necessary allegations to assert RICO violations.

13)     The Plaintiffs' complaint alleges that the Demarco Defendants and the other
Defendants (hereinafter the "management Defendants" and, collectively, with the
Demarco defendants "the defendants")) engaged in a scheme to defraud Allstate in which
Dr. Demarco allegedly incorporated and served as the paper owner of Delta and Avalon
while Gorshtein and Shusterman were the true owners and operated both medical
facilities for the benefit of Akkord and Big Apple and thus, themselves. Complaint ¶95-
97  The complaint fails to set forth the facts that would be the foundation for the
conclusion of control and management.  The allegations are only asserted in broad
ambiguous strokes.  Nowhere does the complaint allege what acts these individuals
performed that constitute the "dominion", "management" and "control" that is alleged.
There is also no mention in any count of what acts constitute a cause of action, under
what law and what specific damages resulted.

14)     The complaint also alleges that the Demarco defendants billed Allstate for
diagnostic tests that were either not performed or performed by persons who were not
employees of either Delta or Avalon. Complaint ¶¶11, 82-86.  In order to qualify under
RICO, the damages for these allegations must be set forth and they are not.  If these
allegations are used to allege some other fraud then they fail to include the necessary
particularity.  Again, there are no facts:  No names of the alleged non-employees, no
specifics as to the bills where the services were not performed were billed from or, if
performed by a non-employee, where they were so performed.  And again, no reference
to these facts in establishing any prongs of any cause of action.

15)     The complaint also alleges that the Demarco defendants arranged for tests to be
performed on the insureds and they knew the tests were not medically necessary because
they were of no diagnostic value and therefore compromised rather than helped patient
health and safety. Complaint ¶¶159-164  There is no factual basis to support these claims
and, in fact, as a radiologist, the necessity of a test is not within Dr. Demarco's purview.
As for the claim that the films were useless because they were produced by the Demarco
defendants' hopelessly outdated equipment, again, there is equally no explanation as to
the basis for the claim, let alone any citation to any authority to support it. Only the bald
faced conclusion that the machine was old and useless and had not been updated.  The
last assertion being an assertion that is refuted by documentary evidence.  Again, no

count or cause of action lays the above allegations as its foundation and no claim to specific damages is alleged.

16)     Plaintiff asserts causes of action grounded in common-law fraud, unjust enrichment and RICO and also seek a declaratory judgment under 28 U.S.C. § 2201 Complaint ¶10. Notably, Plaintiff seeks to recover millions of dollars paid by Allstate to Delta and Avalon based on allegedly fraudulent charges. Complaint ¶8.

17)     Despite the voluminous conclusory allegations and various causes of action, the Plaintiffs' complaint amounts to nothing more than allegations unsupported by sufficient facts and not plead with any particularity that Delta and Avalon were not entitled to submit no-fault claims to Allstate. Plaintiffs have suffered no damages, other than to generally claim the return of every penny every paid to the Demarco defendants. Plaintiffs have not claimed, much less evidenced, that a single patient or a single prescribing doctor complained that the films were of no value. Also, the Plaintiffs' allegations that the Demarco Defendants were paid money without a breakdown of why specific claims were improper (ie. non-employee work product, unusable films, etc.) renders the money damages claimed an unclear and ambiguous claim of damages.

18)     Every cause of action contains allegations of fraud and each lacks sufficient particularity to support a cause of action founded in fraud. The same holds true for the RICO allegations. The complaint should be dismissed pursuant to FRCP 12(c) for failure to state a cause of action for which relief can be granted due to the plaintiffs' failure to plead its allegations of fraud with the particularity required under FRCP 9(b) and, as a result, should also be dismissed under FRCP 12(b)(1). Finally, the plaintiff fails to establish the 3 prongs necessary to sustain a RICO action and the action should be dismissed as the only remaining claims are state causes of action.

19)     The No-Fault law provides that insurers must reimburse "covered persons" for "basic economic loss", which includes medical, chiropractic, and rehabilitation expenses. N.Y. Ins. Law § 5012(a). Here, "covered persons" were treated by licensed healthcare providers who then requested that the insured undergo diagnostic testing by radiologists such as Dr. Demarco at a facility such as Delta and Avalon. The insureds then assign their No-Fault benefits to those facilities who, in turn, submit claims for services directly to the No-Fault insurer (e.g., the Plaintiffs). The No-Fault insurer then makes payment directly to those facilities on behalf of the covered person as "necessary medical expenses."

20)     Now, years after the Demarco Defendants provided valuable medical services to Plaintiff's insureds, dating from at January 2004 through March 2015, where none of the patients have been heard to complain or are parties to this action, Plaintiffs assert that they should recoup all payments and/or be relieved from paying all pending claims, in part, because the tests were provided by independent contractors or not provided at all. Complaint ¶¶11, 84, 121-26, 145-9. No particularity is provided with regard to the above allegations or specific claims alleged to be fraudulent due to these allegations.

3

21)     Since plaintiffs assert claims going back over 11 years, it is clear that they would have known or should have known of any alleged fraud if it existed, particularly where services are claimed to have not been provided.  They have had numerous examinations under oath of patients and ample opportunity to investigate if services were being billed and were not performed.  The statute of limitations on these claims and all other claims of fraud more than 6 years old and claims under RICO that are more than 3 years old have expired and said claims should be dismissed with prejudice. Also, these claims are precluded by no-fault regulations as they did not deny them within 30 days.  Presumably, though we cannot confirm this as no specific claims are set forth, plaintiffs stipulated to waive all defenses and pay claims as well.  Further, the plaintiff's delay in bringing this action has caused prejudice to the ability of the Demarco defendants to defend themselves against the plaintiffs' allegations, resulting in a valid claim of latches.  The baseless, self-serving and conclusory claim that the alleged fraud was purposely hidden from Allstate does not give even an inkling of an idea as to what they allegedly did to hide anything.

22)     Plaintiffs further assert allegations of fraud and material misrepresentation on the grounds that the diagnostic tests performed by Delta and Avalon were not medically necessary because they were of no diagnostic value and were not designed to facilitate the treatment of and/or benefit the insureds who were subjected to them.  Complaint ¶¶157-164.  They fail to explain why these tests were of no diagnostic value, other than general statements that the machine was too old.  The allegations that the machine was past its life span and could not be upgraded are not only conclusory with no factual basis, but false as evidenced by documentary evidence that shows conclusively that the machine was upgraded (Exhibit).

21)     Finally, the plaintiffs' Melella and RICO related causes of action are not pled with sufficient particularity under FRCP (9) and should, therefore, also be dismissed.

22)     The plaintiffs' motion is very much a muddle. As a result, which of its allegations do and do not apply to which of its causes of action is very hard to determine, which,of course, only makes things that much more difficult to understand it and to respond to it. In an effort to help the Court cut through this confusion, the within motion will begin with an Analysis Summary that briefly addresses each Count of the Plaintiffs' complaint individually before moving on to its arguments as to the deficiencies with the complaint more broadly.

## ANALYSIS SUMMARY

## COUNT I

## PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(c)

1.  We are left to scour the long ramblings of mostly conclusory statements in the

    narrative to try and piece together the allegations that may relate to or be the

4

foundation of this count.  No particulars are set forth, no damages and no tie-in to the count to satisfy the necessary prongs.

2.  The four prongs necessary to sustain a RICO claim due to a violation under 1962(c) require that a person engage in the (1) Conduct (2) of an enterprise [by which the person is employed or with which he is associated (3) through a pattern (4) of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) and United States v. Bonanno Organized Crime Family, 683 F. Supp. 1411, 1422, 1429 (E.D.N.Y. 1988), aff'd, 879 F.2d 20 (2d Cir. 1989).

3.  Under any reading of the complaint, the plaintiffs' fail to meet the first prong since they fail to allege any specifics acts that either Dr. Demarco or any other person or persons acting on behalf of Delta or Avalon is supposed to have done to defraud the Plaintiffs. In fact, though  the plaintiffs' complaint alludes to phantom accomplices used by Dr. Demarco and Gorshtein and Shusterman to further their alleged scheme, the plaintiffs never name such other persons, let alone explain how they allegedly conspired with Dr. Demarco to use Delta and Avalon to defraud the plaintiffs.

4.  Similarly, the Plaintiffs' fail to meet the third and fourth prong since, pursuant to the definition of "pattern of Racketeering activity set out in 18 U.S.C § 1961(5), since such a pattern requires the commission of at least 2 "predicate acts", which the plaintiffs' complaint fail to allege in their complaint. Id., Sedima, Supra. Therefore, this count should be dismissed for failing the particularity requirements of F.R.C.P 9(b) and for not meeting the sufficiency of notice requirements of F.R.C.P. 8(a). Id., Bonanno and Cites.

5. Plaintiff must establish continuity which can be either a closed-ended or open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context. *What* in the context of RICO must be continuous are the alleged predicate acts or offenses upon which the RICO claims are asserted. The *relationship* these predicate acts must bear to one another, are distinct requirements. See e.g. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239-40 (1989). These were not plead with particularity and in fact the RICO counts are totally deficient. There is also a heightened requirement for particularity in the case law for RICO as opposed to simply, 'fraud' under Rule 9(b). All RICO claims asserted fail under these requirements.

## COUNT II

### PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(d)

1. Again, one must guess which conclusory allegations are intended to be the foundation of this count. 18 U.S.C. § 1962(d) is a contingent provision of the Statute. That is, it is unlawful under 18 U.S.C. § 1962(d), to conspire with another to violate violate any other provision of 18 U.S.C. § 1962 (i.e., (a), (b) or (c)). Here, the plaintiffs certainly allege that Dr. Demarco conspired with others in violation of 18 U.S.C. § 1962(c). However, for the reasons set out in the analysis summary for Count 1, the plaintiffs have failed to meet the four prong test for alleging a violation of 18 U.S.C. § 1962(c). Therefore, by definition, they fail to properly allege a violation of 18 § 1962(d). Id., Bonanna, Supra.

6

2. Plaintiff must establish continuity which can be either a closed-ended or open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context. *What* in the context of RICO must be continuous are the alleged predicate acts or offenses upon which the RICO claims are asserted. The *relationship* these predicate acts must bear to one another, are distinct requirements. See e.g. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239–40 (1989). These were not plead with particularity and in fact the RICO counts are totally deficient. There is also a heightened requirement for particularity in the case law for RICO as opposed to simply, 'fraud' under Rule 9(b). All RICO claims asserted fail under these requirements.

## COUNT III

## PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(c)

1) Rather than repeat the reasons for which Count I fails, see Summary analysis of Count 1 above as the same prongs are necessary for Count III and the complaint fails to satisfy them.

## COUNT IV

## PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(d)

1) This count fails for the same reasons in the Summary Analysis of Count II above.

## COUNT V

## PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(c)

1) This count fails for the same reasons in the Summary Analysis of Count 1 above.

## COUNT VI

### PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(d)

1)     This count fails for the same reasons in the Summary Analysis of Count II above.

## COUNT VII

### PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(c)

1)     This count fails for the same reasons in the Summary Analysis of Count 1 above.

## COUNT VIII

### PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER 1962(d)

1)     This count fails for the same reasons in the Summary Analysis of Count II above.

## COUNT IX

### PLAINTIFFS FAIL TO STATE A CAUSE OF ACTION FOR FRAUD WITH SUFFICIENT PARTICULARITY AND WITHOUT RICO CLAIMS, THE STATE LAW CLAIMS SHOULD BE DISMISSED

1. Count 9 discusses misrepresentations as being the basis of the fraud alleged; however, no specific damages are listed and no explanation as to what misrepresentations are the basis of the count. Were the alleged misrepresentations regarding the corporate ownership, services being provided by non-employees, services being billed and not provided, services being provided on an old machine, etc.? To simply claim any or all as they relate to every bill paid by the plaintiff is insufficient particularity by definition and interpretation of FRCP 9(b). The defendant cannot build a defense to such a broad, ambiguous and undefined claim of fraud because it cannot understand just what it is that is being claimed against them.

8

2.   The Plaintiffs rely on their broad (not particular) allegations in their factual spew to allege general counts without explaining the specific damages or the factual basis of any of the counts alleged.

### COUNT X

1.   While this section again refers to misrepresentations without explanation, it goes on to refer to the alleged billing scheme.  The reader is left to guess what "fraudulent billing scheme as described more fully in the paragraphs above" to which Plaintiffs are referring to as no section above specifies an alleged billing scheme.  Certainly, this section, though it states the amount of all payments made by plaintiffs to the defendants, fails to explain what particular alleged fraud resulted in what specific damage.

### COUNT X1

1.   This count requests declaratory relief so that Plaintiffs do not have to pay future bills from Delta; however, it also requests reimbursement of all claims paid to the group of defendants.  Again, although the section refers to more specific sets of allegations above, those allegations fail to state the factual basis of fraud with sufficient particularity as discussed herein above.

### COUNT XII

2.   This count requests declaratory relief so that Plaintiffs do not have to pay future bills from Delta; however, it requests reimbursement of all claims paid to the group of defendants.  Again, although the section refers to more specific sets of allegations above, those allegations fail to state the factual basis of fraud with sufficient particularity as discussed herein above.

9

ARGUMENT

POINT I

THE COURT SHOULD DISMISS PLAINTIFFS NON-MALELLA
CLAIMS IN THEIR ENTIRETY SINCE NO-FAULT INSURERS HAVE
THIRTY DAYS TO EITHER PAY OR DENY A NO-FAULT CLAIM

1)     New York Insurance Law § 5106 provides that No-Fault benefits "are overdue if

not paid within thirty days after the claimant supplies proof of the fact and amount of loss

sustained". The applicable regulations further provide that "[w]ithin 30 calendar days

after proof of claim is received, the insurer shall either pay or deny the claim in whole or

in part . . . A duly filed claim can only be properly denied 'on the prescribed denial of

claim form.'" 11 N.Y.C.R.R. § 65.15(g)(3)(i); Presbyterian Hosp. v. Maryland Cas. Co.,

660 N.Y.S.2d 536 (1997); Mt. Sinai Hosp. v. Triboro Coach Inc., 699 N.Y.S.2d 77 (2d

Dep't 1999). An insurer is not, however, forced to make a final determination within that

thirty-day period. The No-Fault regulations also provide that an insurer may obtain

additional time to investigate and process a claim by requesting "verification" of the

treatment within ten business days of receipt of the claim. 11 N.Y.C.R.R. §65.6(d)(1).

2)     The relationship between Plaintiffs and the Demarco Defendants is governed, in

part, by the No-Fault Law. Defendant Demarco is a board certified radiologist licensed to

practice medicine in the State of New York. The prescribing doctors request that an

insured covered under New York State's No-Fault Law undergo MRI testing. Dr.

Demarco, as diagnostic radiologists, reviews and interprets the radiological tests

performed by technicians who are or were in his employ at Delta and at Avalon. It is not

within the purview of the radiologist to pass judgment on the advisability or efficacy of

the prescribed diagnostic tests as part of the treatment for the patients for whom they are

10

prescribed. Nor can a radiologist ethically sua sponte change or modify the prescribing

doctor's orders. The healthcare services provided to the Plaintiffs' Insureds were

rendered following an assignment of No-Fault benefits. The Demarco Defendants were

obligated to prepare a written interpretative report of the tests performed and transmit

same to the prescribing doctor who ordered the tests.

3)      Claims for those benefits were submitted to Plaintiff by the Moving Defendants

pursuant to the No-Fault law. The payments for those healthcare services were required

to be made pursuant to Plaintiff's obligations as No-Fault insurers. Indeed, without

performing and reviewing the subject MRI diagnostic tests, there would be no way for

the Demarco Defendants to know whether or not the test would show that the Insured had

injuries consistent with his/her complaints to the prescribing doctors who ordered them.

Significantly, payment under the No-Fault regulations is not based on the result of the

test, but rather, the performance of the test.

4)      It is well settled that the No-Fault law does not codify common-law principles,

but rather creates new and independent statutory rights and obligations in order to

provide a more efficient means for adjusting financial responsibilities arising out of

automobile accidents. Plaintiff is therefore bound by the claims-handling procedures and

limitations set forth in the No-Fault law and regulations. Motor Vehicle Accident Indem.

Corp. v. Aetna Cas. & Sur. Co., 89 N.Y.2d 214, 652 N.Y.S.2d 584, 587 (1996); Aetna

Life & Cas. Co. v. Nelson, 67 N.Y.2d 169, 492 N.E.2d 386, 501 N.Y.S.2d 313, 316

(1986); Matter of Progressive Ins. Co. v. Ocean Medical Group, Nassau County Supreme

Court, Lockman, J. (10/2/97 N.Y.L.J., p. 33, col. 2) (A-727) (plaintiff insurer required to

arbitrate fraudulent No-Fault claim despite assertion that alleged fraud on the part of the

healthcare provider "vitiated" coverage). Thus, § 5106 - and the thirty-day rule contained therein - are applicable to the disputed billings.

5)    The clear thrust of New York authority acts as a complete bar to the Plaintiff's claims. Furthermore, as more fully set forth supra, neither the legislature nor case law has carved out a "medical necessary" exception to the thirty-day rule. "Having admittedly failed to reject Plaintiff's claims for payment of no-fault benefits within the 30 day period prescribed by Insurance Law §506(a) and 11 N.Y.C.R.R. 65.15(g)(3), the defendant insurer is precluded from now disclaiming coverage on the basis of an asserted defense that the medical services rendered by [the Demarco Defendants] were medically excessive or unnecessary." Hellander v. Progressive Insurance Co., 2002 WL 314154523 (N.Y. Sup. App. Term. 2002).

6)    It is axiomatic that any defenses to a No-Fault claim submission are forever waived if insurer does not raise them within thirty days or request more information within ten days provided by the Legislature and embodied in the No-Fault and decisional law. Presbyterian Hospital v. Maryland, 90 N.Y.2d 274 (1997). While Plaintiffs' common-law and statutory causes of action alleged in complaint might have been properly asserted as defenses to the No-Fault invoices at the time the invoices were submitted, Plaintiffs are now precluded from doing so. Those causes of action which are based on alleged schemes to bill Plaintiff for unnecessary medical treatment and/or engage in improper billing in one form or another - are not given new life simply because they are asserted in a complaint in an effort to get money back rather than as a defense to the payment of benefits.

7)	Although Plaintiffs also seeks relief under theories of common-law fraud, unjust enrichment, RICO as well as a declaratory judgment, all of Plaintiffs' causes of action that are not based fraudulent incorporation and control under <u>Malella v. State Farm</u>, 4 N.Y.3d 313 (2005), which is most of them, are grounded in the belief that they should be able to recover fees paid for invoices submitted for MRIs that were either medically unnecessary due to not having any medical value, or performed by independent contractors rather than either Dr. Demarco or an employee of Delta or Avalon or simply not performed at all. It is well-settled law that any defenses to No-Fault claims submitted by covered insureds involved in covered accidents - regardless of whether the fraud is improper billing (i.e., billing for medical goods or services that were either excessive or not actually provided) or lack of medical necessary - unequivocally are subject to the thirty-day rule. <u>Melbourne Medical v. Utica Mut. Ins. Co.</u>, 4 Misc. 3d 92, (App Term. 2ⁿᵈ and 11ᵗʰ Jud Dists, 2004), <u>Fair Price v. Travelers</u>, 10 NY2d 556 (2008).

8)	New York courts repeatedly have ruled that an insurer waives its right to object to a No-Fault claim - - including objections based on alleged fraud - - if the objection is not raised in a timely manner (i.e., within thirty days). This is a well-settled issue addressed by the Court of Appeals in Presbyterian Hosp., 660 N.Y.S.2d 536 (1997). In that case, Presbyterian Hospital sued Maryland Casualty Company ("Maryland") to recover No-Fault medical payments for services and treatments provided to Maryland's insured. In opposing that action, Maryland raised the defense that its insured was intoxicated at the time of the automobile accident causing the injuries, thereby relieving Maryland of its obligation to provide benefits under the No-Fault law.

13

9)      In addressing Maryland's contentions, the court noted that pursuant to the Insurance Law and the regulations promulgated by the Superintendent of Insurance, an insurer is required either to pay or to deny a claim for No-Fault benefits within thirty days from the date an applicant supplies proof of claim. Id. at 539. The court then ruled that "an insurer may be precluded from interposing a statutory exclusion defense for failure to deny a claim within 30 days as required by" the No-Fault law and regulations. In so ruling, the court reasoned:

> The unavailability of preclusion, as urged by the carrier and dissent, would materially frustrate the purposes and retard the goals of the speedy payment objective of the No-Fault Law. These goals, a driving force behind both the no-fault and liability coverage insurance laws, focus on avoiding prejudice to insureds by providing for prompt payment or disclaimers of claims.
>
>                       \* \* \*
>
> "[t]he tradeoff of the no-fault reform still allows carriers to contest ill-founded, illegitimate and fraudulent claims, but within a strict, short-leashed contestable period and process designed to avoid prejudice and red-tape dilatory practices. To string out belated and extra bites of the apple is, on the present state of the law, inherently contradictory and unfounded under statutes, regulations and policies that pertain to and govern this dispute . . . .
>
> Id. at 541-42 (emphasis added).

10)      This limitation on an insurer's time to challenge a No-Fault claim has been consistently and strictly enforced. See, e.g., New York and Presbyterian Hospital v. Empire Ins. Co., 728 N.Y.S.2d 684 (2d Dep't 2001) (awarding plaintiff hospital summary judgment against insurer where insurer failed to submit denial of claim within 30 days after receipt of hospital's proof of claim); Metro Medical Diagnostics, P.C. v. Lumbermans Ins. Co., 189 Misc.2d 597, 598-99, 734 N.Y.S.2d 368, 369 (Sup. Ct. 2001) (granting plaintiff healthcare provider's motion for summary judgment against defendant

insurer where insurer failed to request IME verification or deny claim within 30 days);

Bonetti v. Inegon Nat'l Ins. Co., 269 A.D.2d 413, 703 N.Y.S.2d 217 (2d Dep't 2000)

(insurance company precluded from denying insured's claim when it objected more than

thirty days after receipt of claim); Metroscan Imaging v. American Transit Co., N.Y.

County Civil Court, K. Smith, J. (12/10/99 N.Y.L.J., p. 27, col. 5) (A-729), modified on

other grounds, Index No. 18430/98, Decision and Order (Civ. Ct. Mar. 27, 2000) (A-

1247); Mt. Sinai Hosp., 699 N.Y.S.2d at 83 (defendant insurer precluded from objecting

to No-Fault claim where it failed to object within the thirty-day period); Loudermilk v.

Allstate Ins. Co., 178 A.D.2d 897, 577 N.Y.S.2d 935 (3d Dep't 1991) (defendant insurer

precluded from denying claim where it failed to verify or deny claim within time limit).


11)     For example, in Metroscan Imaging, Supra, the court granted the plaintiff

healthcare providers'   motion for summary judgment for unpaid claims for medical

services provided pursuant to the No-Fault law. The court held that where the defendant

No-Fault insurer objected to a claim on the ground that the services were excessive, not

medically necessary, or fraudulent, but failed to deny the claim within the thirty-day

period provided by Ins. Law §5106(a), summary judgment was warranted.

> In so ruling, the court stated as follows:
>
> As there is currently no fraud exception to the 30 day rule, all objections
> to plaintiffs' request for summary judgment based on such allegations,
> particularly where unsubstantiated, are rejected. Given the clear intent of
> the no-fault statute, to offer a claimants a quick and efficient system for
> obtaining compensation for economic loss, and given the fact that in the
> twenty-seven year period since its enactment, the courts have found only
> two exceptions to the statute's 30 day rule, this court adheres to the
> statute's purpose and we will not carve out an exception based on
> conclusory and unsubstantiated allegations of fraud.

(emphasis added); see also, Bonetti, Supra at 218 (insurance company's untimely denial of coverage precluded it from denying insured's claims where insurer's assertion was that surgeries were medically excessive).

12)     The Second Department unconditionally reaffirmed that an insurer's failure to reject within thirty days a No-Fault claim submitted by a healthcare provider precludes, as a matter of law, that insurer's ability to disclaim coverage. In New York and Presbyterian Hosp. v. Empire Ins. Co., 728 N.Y.S.2d 684 (2d Dep't 2001), the hospital-assignee of certain No-Fault claims brought an action against various insurance companies for reimbursement of medical bills. The lower court denied the hospital's motion for summary judgment, but the Second Department reversed, ordering the matter remanded to the lower court for entry of a judgment in favor of the hospital and against the insurers plus statutory interest and attorney fees. In so holding, the Second Department held unequivocally that "[t]he defendants failed to reject the claim of plaintiff . . . for payment of no-fault benefits within the 30-day period prescribed by Insurance Law §5106(a) and 11 N.Y.C.R.R. 65.15(g)(3). Under the circumstances, the defendants are precluded from disclaiming coverage." Id. Importantly, the court also categorically rejected the insurers' interpretation of 11 N.Y.C.R.R. 65.15(g)(5), which sets out the insurer's responsibilities once it determines that benefits are not payable based upon the absence of coverage, as somehow extending the thirty-day limit. The Second Department held "The defendants' contention that they are not precluded due to the language of 11 N.Y.C.R.R. 65.15(g)(5) is without merit." There is nothing in that subsection which extends the 30-day limit. Id. (emphasis added).

13)     In sum, the non-Malella causes of action asserted by Plaintiffs herein do not fall within either of the two limited and narrow exceptions to the thirty-day rule discussed in

16

footnote 1, supra. Since Plaintiff did not timely object nor deny payment of the invoices for which they now seek recoupment or a declaration relieving it of payment, Plaintiff's non-Malella claims are time-barred. Plaintiff cannot avoid its failure to comply with the clear import of the No-Fault law by asserting causes of action grounded in common law fraud or other statutes. Indeed, as the Court of Appeals held in Presbyterian Hospital, "No-Fault reform was enacted to provide prompt, uncontested, first-party insurance benefits." Presbyterian v. Maryland, Supra. Thus, "[t]o string out belated extra bites at the apple is, on the present state of the law, inherently contradictory and unfounded under the statutes, regulations and policies" that govern this dispute. Id. Simply put, the integrity of the No-Fault system is more important than any invoice.

14)     "Fraud" cannot be used creatively to raise an otherwise precluded defense to payment of a No-Fault insurance claim despite its failure to reject a claim within the thirty day period provided by Insurance Law § 5106 (a) and 11 NYCRR 65.15 (g) (3) (the so called "thirty day rule"). In the narrow instance where an insurance carrier alleges that the accident in which the injury was allegedly sustained was an accident staged as part of an insurance fraud scheme, the carrier will be permitted to assert the defense despite the failure to have done so within the "thirty day rule", solely because the accident itself, if staged would not be an insured accident. As stated earlier, Presbyterian Hospital, 660 N.Y.S.2d 536 (1997), as well as Central General Hospital v. Chubb Group of Insurance Companies, 643 N.Y.S.2d 654 (2nd Dep't 1996), rev'd on other grounds, 90 N.Y.2d 195 (1997), established that a failure of an insurer to comply with the "thirty day rule" will result in the insurer being precluded from raising any defense, other than the fact that the alleged injury did not arise out of an insured incident. The Court of Appeals

17

has held, however, that it would not "extend this exceptional exemption to excuse [an insurers] untimely defense in relation to treatment being deemed excessive by the insurer". Central General Hospital v. Chubb, Supra, at 199; Vinings Spinal Diagnostic, P.C. v. Liberty Mutual Insurance Company, 717 N.Y.S.2d 466, (Dist. Ct. Nassau Co.2000); Mount Sinai Hospital v. Triboro Coach Inc., 699 N.Y.S.2d 77 (2nd Dep't 1999). Additional text in the Chubb decision makes it clear that an insurer may not assert the treatment rendered was "unnecessary"; Country-Wide Ins. Co. v. Zablozki, 257, A.D.2d 506, 684 N.Y.S.2d 229 (1st Dep't), lv. to app. den'd, 694 N.Y.S.2d 631 (1999).

15)    It has been held that once the "thirty day rule", has been breached by an insurance carrier absent an exception to or extension of the "thirty day rule" a hearing on the merits is not available to the insurer. Liberty v. Tri-State, 188 Misc.2d 835, 729 N.Y.S. 2d 882, (Gartner, NCDC, 8/9/2001). Applying the exception set forth in Chubb, the Appellate Division denied a medical provider's application to vacate an arbitration award in favor of the insurer. The Court held that if the collision was a deliberate event caused in furtherance of an insurance fraud scheme it would not be a covered accident under no-fault law. However, an untimely denial does not preclude a defendant insurance company from asserting the defense that the collision was a staged event in furtherance of an insurance fraud scheme. Metro Medical v. Eagle Insurance, 293 AD 2d 751, 741 N.Y.S.2d 284. In Ocean Diagnostic Imaging v. State Farm, 2004 NY Slip Op. 24342 (App. Term, 2ᵈ Dept.), the Appellate Term upheld denial of a medical providers motion for summary judgment, citing Metro Medical, Supra, for the principal that an untimely denial does not preclude a defendant insurance carrier from asserting the defense that the collision was a staged event in furtherance of an insurance fraud scheme.

18

16)     The non-Malella allegations of fraud made in the instant action against the

Demarco Defendants are distinguishable from those made by the insurance carriers in

Metro Medical and Ocean Diagnostic, Supra. The complaint filed against Defendant

Demarco by the plaintiffs in the present action does not allege that the injuries were

sustained in a fraudulent accident, and would thus be events for which no coverage would

be required. They thus fail under the exception carved out in Central General Hospital,

Supra. Instead, the plaintiffs allege they was defrauded by diagnostic tests which were

not medically necessary, performed by independent contractors or just not done at all. As

outlined above, neither lack of medical necessity or improper billing is a defense which

can be raised beyond the "thirty day rule". Id., Vinings Spinal Diagnostic, Mount Sinai

Hospital and Country-Wide Insurance Co. v. Zablozki, Supra.

17)     At bar, The Plaintiffs do not assert the medical authority upon which they rely to

support their defense to non-payment of the claims based on lack of medical necessity

due to the obsolete nature of the MRI machine used by the Demarco defendants. They do

make very clear, however, that, whatever its source, according to their information, the

MRI machine used by the Demarco defendants has been obsolete for over a decade.

Complaint ¶ 159. As a result, this information was clearly known to Plaintiff and thus

could have been acted on by the Plaintiffs within the thirty-day time period had they

exercised due diligence. Finding that an insurance carrier was essentially "asleep at the

switch", the Civil Court of the City of New York in Yellin v. Liberty Mutual, 192

Misc.2d 285, 746 N.Y.S.2d 244 (2002), in applying the rule articulated in Presbyterian

held that the "thirty-day rule" precluded an insurer from denying claim for services

performed under No-Fault insurance benefits law, since insurer failed to explain why

denial could not have been timely made.

18)     The clear thrust of the above-referenced authority and the mandate of the Court of

Appeals in Presbyterian Hospital is that, "ill-founded, illegitimate and fraudulent claims"

must be contested within thirty days. Presbyterian v. Maryland, Supra.  Thus, it follows

as a matter of law, based on a reading of the complaint, that the Plaintiffs' non-Malella

claims are time-barred and that, as a result, they may not challenge their prior payment,

or their future obligation to pay,  any of those claims on any basis, including "fraud."

Accordingly, such claims for relief must be dismissed in their entirety. Id., Fair Price,

Melbourne and Central General, Supra.

## POINT II

### PLAINTIFF'S NON-MALELLA CLAIMS ARE BARRED
### BY THE EQUITABLE DOCTRINE OF LATCHES

1.      Latches "is an equitable defense that 'bars a plaintiff's equitable claim where he is

guilty of unreasonable and inexcusable delay that has resulted in prejudice to the

Defendant.'" Brennan v. Nassau County, 352 F.3d 60, 63 (2d Cir. 2003) (quoting

Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998)). At bar, the burden is on

Plaintiffs to show why the latches defense ought not be applied. Id. It is a burden they

cannot carry.

   A.      Plaintiff had actual Notice of the No-Fault Claims

1.      Plaintiffs concede its insureds made no-fault claims dating back over a decade ago

for services of which it now claims are not medically necessary. It is surely manifest that

Plaintiff was on notice and was operating under the 30 day no-fault rule discussed above. Now, in an attempt to end run and circumvent the 30 day rule, Plaintiff commenced the current proceeding years after the claims for benefits were made and services rendered by the Delta and Avalon.

      B.      Plaintiff inexcusably delayed in taking action

1.    This Court can and should determine that Plaintiffs' multi-year delay in seeking the relief herein for its non-Malella defenses is per se unreasonable and inexcusable. No valid excuse or explanation has been offered for waiting years to assert these claims. This is precisely the sort of unreasonable delay the latches doctrine was intended to preclude. Indeed, this Court has found latches to be a bar where Plaintiff slept on their rights for a much shorter period than did Plaintiff here. In <u>Cocopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187 (2d Cir. 1996), this Court upheld a finding of latches based on mere five day delay. By analogy, the years of inaction here should trigger the application of the latches defense. As such, the first prong of the test for latches is fully satisfied. Id.

      C.      Moving Defendants are prejudiced by Plaintiffs' delay

1.    With respect to prejudice, the Court of Appeals has recognized that "[o]ne form of prejudice is the decreased ability of Defendants to vindicate themselves that results from [unavailable witnesses] . . . fading memories or stale evidence." <u>Stone v. Williams</u>, 873 F.2d 620, 625 (2d Cir.), cert. denied, 493 U.S. 959 opinion vacated on other grounds, 891 F.2d 401 (2d Cir. 1989), cert. denied, 496 U.S. 937 (1990).

2.    It cannot reasonably be disputed that the Demarco Defendants have suffered prejudice as a result of the plaintiffs' delay in bringing their non-Malella claims. Apart

from the utter absence of relevant documents annexed to its Complaint, there is no doubt

that the passage of time, as well as the enormous volume of patients evaluated by the

Demarco Defendants clearly have dimmed the recollection of the parties and witnesses

involved. The prejudice to the Demarco Defendants is obvious. As such, the second

prong for latches is satisfied. Therefore, this is a classic case for the application of

Latches. Id.

## POINT III

### THE COURT MUST DISMISS PLAINTIFF'S ELEVENTH AND TWELFTH CAUSE OF ACTION AGAINST DEFENDANTS DELTA AND AVALON FOR A DECLARATORY JUDGMENT UNDER 28 U.S.C. §2201

1)     In their eleventh and twelfth causes of action, Plaintiffs allege that Defendants

Delta and Avalon continue to submit claims to Allstate despite the fact that their true

owners Gorshtein and Shusterman, rather than Dr. Demarco. Complaint ¶¶ 345-364. As a

result of such alleged false pretense, Plaintiffs allege that Delta and Avalon are not

entitled to any payment for No-Fault benefits and, therefore, they, as the victims of the

pretense, are entitled to a declaratory judgment to that effect.

2)     The Declaratory Judgment Act is "an enabling act, which confers a discretion on

the courts, not an absolute right on the litigants." State Farm Mutual Automobile Ins. v.

Mallela, et al. 175 F. Supp.2d 401 (E.D.N.Y. 2001) (quoting Utah v. Wycoff, 344 U.S.

237 at 241):

> [In] determining in what manner to exercise that discretion, 'two
> principal criteria guid[e] the policy in favor of rendering declaratory
> judgments: . . . (1) when the judgment will serve a useful purpose in
> clarifying and settling the legal relations in issue, and (2) when it will
> terminate and afford relief from the uncertainty, insecurity and
> controversy giving rise to the proceeding.

Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 1001 (2d Cir. 1969). If either of these

objectives can be met, a court should entertain the action. Id. at p. 413.

3)      The declaratory judgment Plaintiff seeks would effectively preclude Delta and

Avalon from receiving payment for No-Fault benefits as a result of services rendered to

Plaintiff's Insured and subsequently submitted to Plaintiff. Notably, there are no

allegations that the Demarco Defendants: (i) provided services to non-covered persons; or

(iii) that the services provided by Delta and Avalon arose out of non-covered accidents.

4)      Under circumstances similar to those at bar, and involving the very same Plaintiff

State Farm, who similarly sought to be relieved of its payment responsibilities provided

by Defendant Doctors under the No-Fault statute, the Court held that such a claim for

declaratory judgment failed as a matter of law. In State Farm Mutual Automobile

Insurance Company v. Mallela, et al., 175 F. Supp.2d 401, 417 (E.D.N.Y. 2001), the

court declined plaintiffs request for a declaration since such declaration ". . . would not

'serve a useful purpose in clarifying and settling the legal relations in issue [or] . . .

terminate and afford relief from the uncertainty, insecurity and controversy giving rise to

the proceedings." Id. at 418 (quoting Broadview, Supra, at 1001). Plaintiff's claims were

dismissed with leave to repled. Subsequently, the claims set forth in State Farm v. Maella

(2001), Supra, were repled after a constitutional challenge to certain No-Fault

regulations. The Court held that "plaintiff has provided no compelling reason to depart

from [the Courts] ruling in the Prior Order" and held, once again that plaintiff's claim for

a declaration "fails as a matter of law." State Farm Mutual Automobile Insurance

Company v. Mallela, et al., 2002 WL 31946762 (E.D.N.Y. 2002).

5)      Whether by omission or design, Plaintiff has not advised the Court of recent

decisions regarding the exact same diagnostic procedure at issue in the instant action and

in which Plaintiff State Farm was also a party. In decisions rendered a few months ago,

Hellander, M.D., P.C. v. State Farm Insurance Company, 2004 WL 2715277 (N.Y. Civ.

Ct.) (2004); Hellander, M.D., P.C. v. Progressive Ins. Co., 2002 WL 31415453 (N.Y.

Sup. App. Term) (2004), and Hellander v. Allstate Ins. Co., N.Y.L.J., Vol. 227, No. 24

(2002) lower courts declined to hold that paraspinal ultrasound as diagnostic tools were

"not medically necessary". Nor did these courts grant the carriers relief from payment of

No-Fault benefits where the 30-day rule was breached. Notably, Plaintiff State Farm, in

Hellander, M.D., P.C. v. State Farm, Supra, the issue of "medical necessity" of

ultrasound procedures and in which a timely denial was made, the carrier once again

failed. The Court held:

> . . . Defendant's expert's testimony is equivocal and does not meet the
> burden of proof necessary to establish that the testing done by Plaintiff
> was not medically necessary. In the instant matter, we have here, not a
> specific symptom, not a specific disease, not a specific complaint that
> was addressed in a medically ineffective way, according to Defendant:
> rather, according to Defendant's denial form (NF-10) the Defendants
> have a blanket claim that the ultrasound of the paraspinal area is
> ineffective, regardless of complaint or symptomatology. This Court is
> not willing to find a diagnostic tool utilized by physicians to be
> ineffective in all forms of complaints concerning the spine based on
> teetering testimony by Defendant's expert and guidelines instituted by
> the American College of Radiology which clearly establishes that
> doctors are to use their own judgment in ordering different tests and
> that their conclusions are not binding upon any medical personnel.
>
>                              * * *
>
> . . . [I]n reviewing the standard concerning medical necessity it is quite
> clear that this is to be viewed on a patient by patient basis and that
> testing, whether medically necessary or not, should be based upon the
> symptomatology and complaints and disease entities of the
> patient/assignor involved.

* * *

> . . . [I]t is not a Court's function based upon the testimony presented in this matter to rule a diagnostic modality ineffective for all spinal treatments when the College of Radiology is perplexed about the effectiveness or ineffectiveness of such. A broad stroke of the brush in such an instance would not be beneficial to the medical profession and, in particular, to the patients they treat.

6)      At bar, unlike Hellander v. State Farm, Supra, it is undisputed that Plaintiff herein did not deny any of the subject claims within thirty days of submission of the proofs of claim. A review of Plaintiff's Complaint also fails to reveal any such documentation that Plaintiff even paid these claims. Thus, Plaintiff is forever time-barred by the thirty-day rule from asserting any objections to these invoices and/or claims - which all amount to allegations of improper billing for the medical necessity of such ultrasound. Mt. Sinai Hosp., Supra, at 82 (unless No-Fault insurer can establish that it qualifies for one of the narrow exceptions, "it must be precluded from raising any defense to [the heaflthcare provider's] action because of its failure to deny the hospital's claim within the statutorily prescribed 30 days") (emphasis added).

POINT IV

THE COURT MUST DISMISS PLAINTIFF'S RICO
CLAIMS AGAINST THE DEMARCO DEFENDANTS

1)      Plaintiff's Complaint at ¶¶ 165-81 alleges RICO theories against Delta and Avalon based on violation 18 U.S.C. § 1341. Further, Plaintiffs also allege that Dr. Demarco, along with the management defendants, violated 18 U.S.C. § §1962(c) in their first, third, fifth and seventh causes of action. Complaint ¶¶ 220-38, 247-65, 274-93 and 303-22. It also alleges a §1962(d) claim against Dr. Demarco and the management

25

defendants in their second, fourth, sixth and eighth causes of action. Complaint ¶¶ 239-46, 266-73, 294-302 and 323-31. The Court must dismiss these claims against Dr. Demarco since Plaintiffs do not and cannot allege that he conducted the RICO scheme or that he committed the predicate acts that purportedly harmed the Plaintiffs.

A.    The Court Must Dismiss Plaintiff's Claims against the Demarco defendants under 18 U.S.C. §1962(c) Since Plaintiffs have failed to Sufficiently Plead a Pattern of Racketeering

1)    Under Section 1962(c), a plaintiff must show, inter alia, that each "person" named as a defendant engaged in the "(1) conduct (2) of an enterprise (i) via a pattern (3) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); United States v. Bonanno Organized Crime Family, 683 F. Supp. 1411, 1422, 1429 (E.D.N.Y. 1988), aff'd, 879 F.2d 20 (2d Cir. 1989). Similarly, under Section 1962(a), a plaintiff must show that each person named as a defendant engaged in a pattern of racketeering activity. See Quaknine v. MacFarlane, 897 F.2d 75 (2nd Cir. 1989); see also, Vicom, Inc. v. Harbridge Merchant Serv., Inc., 20 F.3d 771, 778 (7th Cir.) 1994); In Re Burzynski, 989 F.2d 733, 741-42 (5th Cir. 1993) (per curiam).

2)    Under Section 1962(a) or 1962(c), plaintiff must prove that each defendant engaged in at least two acts of racketeering in furtherance of the illegal enterprise. See 18 U.S.C. §1961(5); Sedima, Supra, at 496 n. 14; McLaughlin v. Anderson, 962 F.2d 187, 192 (2d Cir. 1992) ("the bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts"); Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983); Trask v. Kasenetz, 818 F. Supp. 39, 42 (E.D.N.Y. 1993). The focus of a RICO action is "on the individual patterns of

26

racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise." Bonanno, Supra, at 1429 (quoting United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987)). Because a plaintiff must establish that each person sought to be held liable has engaged in at least two acts of racketeering, "actions brought against multiple defendants must clearly specify the claims with which each particular defendant is charged." Bonanno, 683 F. Supp. at 1429 (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure, §1248 at 226 (1969)).

3)      In Bonanno, Supra, the government brought a civil RICO action against an organized crime family, a union, the union's executive board, employee benefit funds and several individuals, alleging extortion, gambling, usury and labor racketeering. 683 F. Supp. at 1419. The Court in Bonanno, Supra, dismissed claims based upon broad allegations of criminal wrongdoing because they did not specify "how the [specific] defendants associated themselves with the predicate acts, participated in them as something they wished to bring about, or sought by their actions to make them succeed", and therefore failed to "give each defendant sufficient notice as to the predicate acts alleged against him." Id. at 1429; See United States v. Private Sanitation Indus. Ass'n, 899 F. Supp. 974, 985 (E.D.N.Y. 1994), aff'd, 47 F.3d 1158 (2d Cir. 1995); Buck Creek Coal, Inc. v. United Mine Workers, 917 F. Supp. 601, 613 (S.D. Ind. 1995) (plaintiff failed to state a claim against union defendants because the complaint "alleged no facts on which to base its conclusory statement that the [individual defendants] engaged in, ratified or authorized acts of violence").

4)      At bar, Plaintiff has failed to meet these strict pleading requirements. The gravamen of Plaintiff's RICO action is that Defendant Demarco colluded with

Defendants Gorshtein and Shusterman to have them operate and control Delta and

Avalon through Big Apple and Akkord which, together with their submission of bills to

Allstate for which they were not entitled to payment, formed a pattern of "racketeering

activity". Complaint ¶165. Plaintiff also alleges that, in furtherance of the scheme,

Defendants repeatedly violated federal mail and fraud statutes in violation of 18 U.S.C. §

1341, Complaint at ¶¶ 165. However, these allegations fail to identify who caused the

fraudulent communications to be made, when the statements were made, or how the

communications furthered the aims of the enterprise. See, e.g., McLaughlin, Supra, at

191; Wasserman v. Maimonides Medical Center, 970 F. Supp. 183, 187-88 (E.D.N.Y.

1997); Mathon v. Marine Midland Bank, N.A., 875 F. Supp. 986, 996-97 (E.D.N.Y.

1995). Since Plaintiff's allegations of RICO do not clearly specify the predicate acts with

which each particular defendant is charged, these allegations should be dismissed for

failure to sufficiently plead a pattern of racketeering activity.

5)      Pursuant to 18 U.S.C. § 1961(5), Plaintiffs must allege that Dr. Demarco

committed at least two predicate acts so as to establish a pattern of racketeering activity

sufficient to make out a RICO claim. Plaintiff sets forth all of the alleged "predicate acts"

in ¶51 of the Complaint - - violations of 18 U.S.C. §1341 (mail fraud), which clearly fail

for lack of specificity. Also, in order to plead a violation of Section 1962(c) properly,

Plaintiffs must allege that Dr. Demarco actually did "conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity." 18 U.S.C. §1962(c); Reves v. Ernst & Young, 507 U.S. 170, 185 (1993) ("to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, . .

. one must participate in the operation or management of the enterprise itself"). "[S]imply

28

aiding and abetting a violation is not sufficient to trigger liability" under RICO. United States v. Viola, 35 F.3d 37, 40-41 (2d Cir. 1994). Here, Plaintiffs have not alleged that Dr. Demarco played any active role in the alleged RICO scheme, much less "participated in the operation or management of the enterprise". In fact, just the opposite, the Plaintiffs allege that Dr. Demarco took no part in the operation of either Delta or Avalon. The plaintiffs do attempt to provide some particularity to RICO claims of their complaint with a table of generated mailings in Exhibits 3 and 4 of their complaint, incorporated by reference in Paragraphs 174 and 184, respectively, of the complaint, but by the Plaintiff's own account, none of the mailings, on their face, show anything improper,

6)      As a result,  they do not describe the acts that Dr. Demarco allegedly performed to have participated willfully, knowingly or even innocently in the alleged scheme against Allstate, let alone cite any dates, or name any names as to who Dr. Demarco plotted with on those dates, the Court must dismiss the Section 1962(c) claim. In short, Plaintiffs failed to plead the predicate acts of mail fraud required to support their RICO complaint, and the claim should be dismissed. See Mills v. Polar Molecule Corp., 12 F.3d 1170, 1176-77 (2d Cir. 1993); Greenes v. Empire Blue Cross & Blue Shield, No. 92-C8599, 1996 U.S. Dist. LEXIS 16469, at *14-15 (S.D.N.Y. Nov. 4, 1996).  Accordingly, the Court must dismiss Plaintiff's claims under RICO. Id., Reves and Mills, Supra.

## POINT V

### THE COURT MUST DISMISS PLAINTIFF'S MALELLA RELATED FRAUD CLAIMS AGAINST THE DEMARCO DEFENDANTS SINCE THEY FAIL TO STATE A CLAIM UNDER RULE 9(b) or 8(a)

1)      The allegations of fraud contained in the Plaintiff's complaint against the Demarco defendants lack the particularity required under FRCP 9(b) and, as a result, are

consequently allegations that are incapable of supporting a cause of action based upon fraud.

2)      In order to establish a claim of fraud, Plaintiffs must prove the following five elements: (i) misrepresentation of material fact; (ii) the falsity of such misrepresentation; (iii) scienter; (iv) reliance; and (v) damages. See Bank of Leumi Trust Co. of New York v. D'avori Int'l, Inc., 558 N.Y.S.2d 909, 914-915 (1st Dep't 1990); Jo Ann Homes at Bellmore, Inc., et al. v. Aaron Dworetz, et al., 302 N.Y.S.2d 799 (1969); Busino v. Meachem, 704 N.Y.S.2d 690, 693 (3rd Dep't 2000); Berger-Vespa v. Rondack Bldg. Inspectors Inc., 740 N.Y.S.2d 504, 507 (3rd Dep't 2002) (justifiable reliance and injury or damages are elements of fraud); Lasalle Nat'l. Bank v. Ernst and Young, LLP, 729 N.Y.S.2d 671, 677 (1st Dep't 2001); American Home Assurance Co. v. Gemma Const. Co. Inc., 713 N.Y.S.2d 48, 53; State Farm Mutual Automobile Ins. Co. v. Mallela, 175 F. Supp.2d 401, 418 (E.D.N.Y. 2001) (citing Congress Financial Corp. v. John Morrels & Co., 790 F. Supp. 459, 469 (S.D.N.Y. 1992)). Scienter is defined as:

> A term usually employed in legal issues, involving fraud, means knowledge on the part of the person making representations, at the time they were made, that they are false . . . the false statements must have been made intentionally to deceive or with what is recognized as the legal equivalent to a deliberately fraudulent intent to deceive.

Gifis, Baron's Law Dictionary, [4th Ed.] at 453 (1996).

3)      Fed. R. Civil Pro 9(b) requires particularity as to the fraud allegations and requires the pleader to state the time, place and content of the misrepresentation, the fact misrepresented and what was obtained or given up as a consequence of the fraud. "[W]hen a complaint charges fraud, it must (1) detail the statements (or omissions) that the Plaintiff contends are fraudulent, (2) identify the speaker; (3) state where and when

30

the statements (or omissions) were made, and (4) explain why the statements (or

omissions) are fraudulent." Harsco Corp. v. Sequi, 91 F.3d 337, 348 (2d Cir. 1996). 2

Moore's Federal Practice S. 903[1] (Matthew Bender 3d Edition).


4)   At Bar, the plaintiffs fail to come close to meeting this bar. Specifically:

a)   Allegations 1-6, 14, 15, 26, 27, 37, 65, 81-88, 97 and 100-06 of plaintiffs' complaint are not sufficient to support a cause of action because all of the accusations therein of medical billing fraud due to the fraudulent incorporation of Delta and Avalon due to the improper ownership and control of by defendants Gorshtein and Shusterman rather than Dr. Demarco, in addition to being untrue, are wholly conclusory in nature without any factual basis or support.

i.        For instance, Paragraph 4 of plaintiff's complaint alleges that Demarco conspired with Gorshtein and Shusterman to have them, and not Dr. Demarco, "unlawfully operate Delta and Avalon in direct violation of New York and federal law".

ii.        Similarly, Paragraph 6 of the plaintiff's complaint alleges that Gorshtein and Shusterman "caused" Dr. Demarco to incorporate both Delta and Avalon and Paragraph 37 of the complaint says Gorshtein and Shusterman "used Akkord to unlawfully operate [either Delta or Avalon or both] and to unlawfully share in the physician fees collected by [them]". Also, Paragraph 14 says "the defendants' ...scheme was...designed...to elicit payment...from Allstate", Paragraph 97 says "Demarco allowed Gorshtien and Shusterman, acting through Big Apple and Akkord, to admisister the day to day operation, management and/or control of Delta and Avalon and Paragraph 106 says that "to further the scheme, [Gorshtein and Shusterman] used "certain arrangements" to exert unlawful control over Avalon".

iii.        However, none of the paragraphs in the plaintiffs' complaint say anything at all as the manner in which, or the means or "arrangements" by which, Gorshtien and Shusterman managed to exercise this control, let alone any specific action that either one of them took that "caused" Dr. Demarco to do anything.

iv.        Further, nowhere in their complaint do the plaintiffs allege with any particularity when or where Dr. Demarco was supposed to have conspired with anyone, let alone any particularity as to how this alleged conspiracy is supposed to have come about.

v.        Finally, nowhere in their complaint do the plaintiffs allege with any particularity with what persons they spoke or what documents or other sources of information they reviewed that prompted their belief that Gorshtien and Shusterman controlled Delta and Avalon.

b)   Allegations 6-9, 11, 81-85, 120-23, 147-53 of the plaintiffs' complaint are not sufficient to support a cause of action because the allegations therein of medical billing fraud due to the submission of bills by Delta and Avalon for services not performed Dr. Demarco but rather by independent contractors for either the technician, or physician. component of the bills (or both), as wells as the submission of bills for services that were

not even actually performed at all, in addition to being untrue, are wholly conclusory in nature without any factual basis or support.

i.       For instance, Paragraph 6 of the plaintiff's complaint alleges that Dr. Demarco, Delta and Avalon (Hereinafter, whenever referred to collectively ("the Demarco defendants") "hired independent contractors to perform diagnostic radiology services" and then sought reimbursement as though he performed the services.

ii.      Similarly, Paragraph 54 of the complaint intimates that the Demarco defendants billed the plaintiffs for services that "were never provided" and Paragraphs 121-26 alleges that Dr. Demarco actually spent very little time at either Delta or Avalon and therefore couldn't possibly have been able to "hire, supervise and/or train the people who worked there".

iii.     However, none of the paragraphs in the plaintiffs' complaint allege anything specific to support this accusation. That is, under both New York and federal law, whether an individual is an employee or an independent contractor depends on whether it is the individual worker or the place at which the work is done that sets a number of different conditions (no one of which is determinative) like, the hours at which and the manner in which the work is to be done, when and where work breaks are to be taken, etc.

iv.     In contrast, here, plaintiffs allege nothing at all even as to who the individuals the defendants allegedly hired as independent contractors were, let alone anything specific as to just what factors under either New York or federal law that the defendants violated that made those individuals independent contractors of Delta and Avalon rather than employees. They also do not allege any facts to support their allegation that Dr. Demarco did not spend much time at Delta or Avalon or allege with particularity on what dates or at what times the phantom independent contractors alluded to in their complaint supposedly worked at either facility, let alone what type of work they did there for the bills submitted to Allstate (i.e., the technician component or physician component of the bill) on those dates.

v.      Finally, nowhere in their complaint do the plaintiffs allege with any particularity with what persons they spoke or what documents or other sources of information they reviewed that prompted their belief that the Demarco defendants submitted bills to Allstate for services that, for either part or all of any given bill, were either not done by Dr. Demarco but independent contractor, or simply not done at all.

c)      Allegations 4, 12 and 65 of the plaintiffs' complaint are not sufficient to support a cause of action because the allegations therein of Racketeering due to violations of New York and Federal law by the Demarco defendants, on top of being untrue, are wholly conclusory in nature without any factual basis or support.

i.       For instance, Paragraph 12 of the plaintiff's complaint, in addition to common law fraud and unjust enrichment, alleges that the Demarco defendants violated Federal RICO law based upon their violation of various New York statutes and regulations set out in Paragraphs 46-64.

ii.      Further, Paragraph 65 of the plaintiff's complaint says that the factual basis of those violations is "detailed below" but, as explained in Paragraphs 3-6 below, none of

the details provided in the plaintiffs' complaint that are actually specific in no way support any allegation of fraud.

iii.     Moreover, none of the paragraphs in plaintiffs' complaint ever allege that on such and such a date, at such and such a location, Dr. Demarco, or Mr. Gorshtein or Mr. Shusterman took such and such an action, that would constitute a violation of the Ricco law, or any other New York or federal law. Indeed, none of the specific, non-conclusory, allegations in their complaint allege any facts that constitute a violation of so much as a single provision of the claim review process of the New York No-Fault regulations whose violation would be sufficient basis to even deny a claim, let alone be a sufficient basis to establish the fraudulent nature of one.

iv.     Finally, nowhere in their complaint do the plaintiffs allege with any particularity with what persons they spoke or what documents or other sources of information they reviewed that prompted their belief that the Demarco defendants violated any New York State or Federal law or regulation.

d)     Allegations 6, 86, 98, 99 and 103 of the plaintiffs' complaint are not sufficient to support a cause of action because the allegations therein of Delta and Avalon entering into one-sided arrangements as to the operation and management of Delta and Avalon for the Benefit of Akkord and Big Apple and, thus, Gorshtein and Shusterman, in addition to being untrue, are wholly conclusory in nature without any factual basis or support.

i.      For instance, Paragraph 6 of the plaintiff's complaint says Mr. Gorshtein and Mr. Shusterman "required" Dr. Demarco to "enter into…one-sided arrangements governing the operation and management of [Delta and Avalon] by [Akkord and Big apple], including….the use of space and MRI equipment".

ii.     Similarly, Paragraphs 98 and 99 of the plaintiff's complaint alleges that, through these arrangements, Delta and Avalon paid "exorbitant" sums for "purported "rent" and other expenses".

iii.    However, none of the paragraphs in the plaintiffs' complaint say anything at all as to just what Delta and Avalon were paying for the use of equipment, or in rent or anything else, let alone what the prevailing market rate for those items or services were in the area where Delta and Avalon were located, let alone any basis as to why what Delta and Avalon were paying for them was excessive.

iv.     Moreover, none of the paragraphs in the plaintiffs' complaint allege with any particularity just what, if anything, besides the price of the agreements was one-sided about them. That is, where the terms of use previsions unfair to Delta or Avalon? Were the cancellation provisions or the notice of defect previsions unfair to them? If so, in what way? If not, then why were the agreements so one-sided in favor of Gorshtein and Shusterman? The plaintiffs' complaint doesn't say.

v.      Finally, nowhere in their complaint do the plaintiffs allege with any particularity with what persons they spoke or what documents or other sources of information they reviewed that prompted their belief that the Demarco defendants entered into one-sided arrangements as to the operation and management of Delta and Avalon for the Benefit of Akkord and Big Apple and, thus, Gorshtein and Shusterman.

e)     Allegations 100-103, 110 and 154-64 of plaintiffs' complaint are not sufficient to support a cause of action since the allegations therein of Delta and Avalon using obsolete

equipment, besides being untrue, are conclusory and without any factual or authoritative basis or support.

i.    For instance, Paragraph 110 of the plaintiff's complaint alleges that the MRI machine used by the Demarco defendants is "utterly obsolete and incapable of producing images of any diagnostic value".

ii.   Also, Paragraphs 154-156 of the plaintiffs' complaint allege that the MRI machine used by Delta and Avalon (Hereinafter "the MRI machine herein") is a 1994 model that has "a ten year life span" and is thus "outdated" since, unlike some other MRI machines, it is not capable "of being upgraded to a current production model".

iii.  However, none of the paragraphs in the plaintiffs' complaint say anything at all as to just what it is about the images produced by the MRI machine herein that makes them lack value. Are they of insufficient resolution? Are they instead just as clear as the images produced by newer MRI machines but are still worthless because they are more likely to be wrong? The plaintiffs' complaint does not say, just as it does not say why, unlike some other MRI models, the one herein is not capable of being upgraded to a current production model.

iv.   Moreover, upon information and belief, the image quality of an MRI machine is dependent upon two main, but not sole, factors: the size of the magnet powering the machine and the length of time the patient stays in the machine. Thus, and contrary to the plaintiffs' complaint, the quality of the image produced by a newer MRI with a magnet twice the size of the one in the MRI machine herein after 20 minutes in the machine will be the same as the image quality produced by the MRI machine herein after 40 minutes in the machine, even if no other types of upgrades are made to it. Therefore, even if the plaintiffs' contention that the MRI machine herein is not capable of being upgraded were true, its allegation that, as a result, it is "obsolete and incapable of producing images of any diagnostic value" would still be wholly without merit. Moreover, for the reasons explained in Point vi below, that contention is not true.

v.    Finally, nowhere in their complaint do the plaintiffs allege with any particularity with what medical or technological experts to whom they spoke or what technical or medical journals, treatises or other publications or authorities they consulted to arrive at their conclusion that MRI machine used by the Demarco defendants was obsolete "and incapable of producing images of any diagnostic value".

f)   The 1st, 3rd, 5th and 7th of the plaintiffs' demands for relief should be dismissed because the assertions therein as to the wrongdoing by the defendants against Allstate's due to their violation of 18 U.S.C § 1962(c) are part and parcel of the laundry list of vague, unsubstantiated and untrue allegations of fraud contained in the main body of their complaint discussed above and, therefore, are wholly conclusory in nature without any factual basis or support.

g)   The 2nd, 4th 6th and 8th of the plaintiffs' demands for relief should be dismissed because the assertions therein as to the wrongdoing by the defendants against Allstate's due to their violation of 18 U.S.C § 1962(d) are part and parcel of the laundry list of vague, unsubstantiated and untrue allegations of fraud contained in the main body of their complaint discussed above and, therefore, are wholly conclusory in nature without any factual basis or support.

34

h)   The 9th and 10th of the plaintiffs' demands for relief should be dismissed because the allegations therein as to the damages suffered by Allstate due to the unjust enrichment and common law fraud committed against it by the Demarco defendants are part and parcel of the laundry list of vague, unsubstantiated and untrue allegations of fraud contained in the main body of their complaint discussed above and, therefore, are wholly conclusory in nature without any factual basis or support.

i)   The 11th and 12th of the plaintiffs' demands for declaratory relief should be dismissed because the assertions therein as to the damages suffered by Allstate due to the actions and wrongdoing of the Demarco defendants are part and parcel of the laundry list of vague, unfounded and untrue allegations of fraud contained in the body of their complaint discussed above and, therefore, are wholly conclusory in nature without any factual basis or support.

5)   Moreover, all the rest of the allegations and demands for relief in the plaintiffs' complaint are either repetitive of one or more of the paragraphs described above or either do not concern any of the Demarco defendants or are in no way fraudulent in nature, despite the best efforts of the plaintiffs to breathlessly, and, of course, repeatedly, paint them that way, just as they use the technique of repetition to try and paint their vague and unsubstantiated allegations of fraud as being substantive as well. Hayduk v. Lanna, 775 F.2d 441 (1ˢᵗ Cir., 1985) citing the admonition in Segal v. Gordan, 467 F.2d 607 at 707-08 (2ⁿᵈ Cir., 1972) that "referrals to plans and schemes are too conclusional to satisfy the particularity requirement [of FRCP 9(b)], no matter how many times such accusations are repeated".

6)   Specifically, stripped of the loaded, unfound and untrue characterizations with which the plaintiffs festoon them, the only specific allegations the plaintiffs make against any of the Demarco defendants that in any way bear on their complaint are as follows:

    a) Dr. Demarco is a physician licensed to practice in New York (Complaint ¶ 19).

    b) Delta is a domestic New York corporation owned by, and incorporated by, Dr. Demarco (Complaint ¶ 22).

    c) Avalon is a domestic New York corporation owned by, and incorporated by, Dr. Demarco (Complaint ¶ 25).

    d) Both Delta and Avalon submitted previous no-fault claims to Allstate and continue to submit such claims to Allstate (Complaint ¶ 348, 358).

    e) Both Delta and Avalon hire lawyers to litigate and dispute claims that are denied by Allstate (Complaint ¶ 213).

    f) All the bills, medical reports, etc., submitted to Allstate by Delta and Avalon were submitted through the mail (Complaint ¶ 165-167).

    g) All the bills submitted to Allstate by Delta and Avalon indicated that the MRIs billed for were both performed and interpreted by Dr. Demarco or an employee of Dr. Demarco's office (Complaint ¶ 120, 148).

h) Dr. Demarco attested to the medical necessity of all the bills submitted to Allstate by Delta (¶ 189) and Avalon (Complaint ¶ 203).

i) The MRI machine used, first by Delta, then by Avalon, is a 1994 model Hitachi MRP 5000 MRI scanner (Complaint ¶ 100-03).

j) Most of the bills submitted to Allstate by Delta and Avalon bore Dr. Demarco's electronic signature (Complaint ¶ 133,134).

k) Some of the bills submitted to Allstate by Delta and Avalon did not contain Dr. Demarco's signature (Complaint ¶ 132).

l) None of the bills submitted to Allstate from Delta indicate any ownership interest in Delta by Gorshtein or Shusterman (Complaint ¶ 182, 184).

m) None of the bills submitted to Allstate from Avalon indicate any ownership interest in Avalon by Gorshtein or Shusterman (Complaint ¶ 184).

n) Dr. Demarco has been the subject of professional discipline in New York and New Jersey (Complaint ¶ 89).

o) The address that Delta has on file with the New York Secretary of State's office is 275 Avenue X in Brooklyn (Complaint ¶ 109).

p) 275 Avenue X in Brooklyn does not have MRI equipment on site (Complaint ¶ 109).

q) The address at which Delta conducted the diagnostic services for which it billed Allstate is 61 Avenue in Brooklyn (Complaint ¶ 109).

r) Avalon's address is 2085 W. 11ᵗʰ Street in Brooklyn (Complaint ¶ 113).

s) 2085 W. 11ᵗʰ Street is located on the west side of the building that also contains 61 Avenue U (Complaint ¶ 113).

t) Delta's incorporation was prior to that of Avalon's in 2012 (Complaint ¶ 92, 93).

u) The address that Big Apple has on file with the New York Secretary of State's office is 275 Avenue X in Brooklyn, 2ⁿᵈ Floor (Complaint ¶ 115).

v) Delta and Akkord have similar phone numbers (Complaint ¶ 119).

w) The address that Akkord has on file with the New York Secretary of State's office is 61 Avenue in Brooklyn, Unit A (Complaint 117).

x) The address that appears on the bills submitted by Delta is 61 Avenue in Brooklyn, Unit B (Complaint ¶ 117).

y) No scheme by the Demarco defendants to defraud Allstate is readily apparent from the face of the documents submitted to it by Delta and Avalon (Complaint ¶ 192).

7)    All of these factually specific allegations however, are of no moment, even the ones that, like many of the plaintiffs' conclusory fraud allegations, are repeated in multiple other paragraphs besides the one(s) cited above. They certainly are insufficient to make out any claim of fraud. The address Delta has on file with the New York Secretary of State is not where it provides its services? So what? Both delta and Akkord operate out of a building located on 61 Avenue U. Avalon's address is 2085 West 11ᵗʰ St., which is located on the west side of the same building. And? Dr. Demarco attested to the medical necessity of all of the bills submitted to Allstate by Delta and Avalon? Well, duh. No scheme to defraud Allstate by the Demaro defendants is readily apparent from the documents submitted by Delta and Avalon to Allstate? Yeah, no kidding.

8)    In addition, none of the allegations of fraud listed in Paragraph 4(a)-(e), or any of the many other allegations of fraud contained in the plaintiffs' complaint, are sufficiently specific in any meaningful way to be of any moment either. Dr. Demarco, Gorshtein and Shusterman conspired with each other to defraud Allstate by submitting claims from Delta and Avalon to Allstate for services that were never rendered or where rendered by persons who were not employees of Delta or Avalon? While it's true that Allstate provides some detail as to what bills to which one or another (or some unspecified combination) of its allegations apply, just what dates of service for what patients in the records of Delta or Avalon is Dr. Demarco supposed to look into to try and formulate a defense to that particular accusation? And in any case, even if to just what bills that particular allegation applies were specified, without any information as to which component of the bill, if not both of them, were supposedly performed by somebody else, or who that somebody else was, the question still remains: How exactly is Dr. Demarco

37

supposed to defend himself against an allegation for which he has no useful information to go on to try a formulate a defense?

9)     Similarly, Allstate's allegation that Gorshtein and Shusterman are the real owners of Delta and Avalon, not Dr. Demarco is also opaque. On what basis does Allstate make this accusation? How exactly are the Demarco defendants supposed to disprove either it or any of the other collection of negatives that comprise plaintiffs' complaint (i.e. that Gorshtein and Shusterman exercised inordinate control over Delta and Avalon; that Dr. Demarco, Gorshtein and Shusterman conspired with each other to secretly funnel money from Delta and Avalon to Big Apple and Akkord (and thus to Gorshtein and Shusterman, etc.)? The answer, of course, is that Allstate has not brought its complaint against the Demarco defendants on any factual basis to which it really expects any meaningfully informed, and thus meaningful, response from them. Rather, it has filed its complaint against the Demarco defendants under the hopes that, through discovery, it can uncover a factual basis to substantiate the allegations against them that, lacking any pertinent factual basis, its complaint spins out of whole cloth and conjecture against them.

10)     Based on the above, it's clear none of the plaintiffs' factually specific allegations in any way establish anything close to a sufficient basis to support a claim of fraud and none of the plaintiffs' allegations that do allege fraud are in any way factually specific enough as to the time, place and circumstances that constitute the factual basis of the fraud on the part of the Demarco defendants that the plaintiff is alleging to satisfy FRCP 9(b). No allegations as to who said what to whom. No allegations as to when, or where, whatever was said was said. No allegations as to how the alleged fraudulent control was exercised, let alone any details as to how it was committed. In fact, nothing whatsoever as

38

to anything at all that would constitute a sufficient factual basis to substantiate an allegation of fraud. Zero. Nada. Zilch.

11)     As a result, were one to pick a man at random of the street, read him the list of the factually specific allegations set out the plaintiff's complaint described in Paragraph 6 above and then ask him to invent a set of fraudulent allegations against the Demarco defendants out of whole cloth, the resulting work of creative fiction of his complaint would bear an amazing resemblance to the complaint concocted by the plaintiffs: Lots of conclusory allegations of collusion to defraud, lots of references to phantom third parties who either knowingly or unknowingly were part of the scheme to defraud, lots of citations to all sorts of state and federal laws supposedly broken and lots of references to the use of the mails in the breaking of those laws but not one particular factual allegation of any specific act of fraud; nothing so dull and pedestrian as any allegations with any specifics in them that actually put some meat as to who, what, when and where on the skeletal outline of fraud that constitutes their complaint; nothing so boringly rudimentary as any allegations as to the basis of the plaintiffs' belief in the fraud alleged in their complaint and certainly nothing as potentially usefully to the defendants as any allegations that didn't put them in a position of having to disprove a negative in order to establish their innocence. Therefore, plaintiffs' complaint should be dismissed because allegations of fraud that lack sufficient particularity under FRCP 9(b) are inherently insufficient to sustain a complaint based on fraud. Hayduk and Segal, Supra, Thomason v. Nachtrieb, 888 F.2d 1202 (7ᵗʰ Cir., 1989) and Era v. Morton Community Bank, 8 F. Supp. 3d 66, (D. R.I. 2014). (Compare Barthelmes v. Kimberly-Clark Corp., 2014 U.S. Dist. Lexis 183115 (D. Mass., 2014) (Complaints that aver sufficient specific facts to

alert the defendant as to the time, place and content or nature of the purportedly false statements or actions of which the defendant allegedly committed do satisfy FRCP 9(b)).

12)    In fact, the plaintiffs' complaint is so lacking, it fails to meet even the sufficiency of notice required under F.R.C.P. 8(a). Specifically, " F.R.C.P. Rule 8(a) requires that a complaint set forth "a short plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds on which it rests" Bonanno, Supra. These requirements are applicable to RICO cases and "it's imperative that the court and defendants be placed on clear notice as to what is being alleged and what the substance of of the claim is in order to facilitate a decision on the merits of the case". Id., citing Ralston v. Capper, 569 F. Supp 1575 (E.D. Mich., 1983) and Gregoris Motor v. Nissan Motor Corp., 630 F. Supp. 902. " For instance, in Ralston, Supra, the plaintiffs claimed that the defendants violated RICO against them by taking part in a Medicaid scheme to bill for medical tests that were either unnecessary or not even performed in the first place. The Court, however, found the plaintiffs' complaint to be insufficient because it failed to provide the defendants in the case with the notice to which they were entitled as to "the type of "enterprise" that they as persons were "employed by or associated with" due to the vague and and conclusory nature of its bald allegations that they submitted bills to Medicaid for tests that were either unnecessary or not provided.

13)    Similarly, in Gregoris Motor, Supra, the plaintiffs made vague allegations of racketeering against the defendants in the case. In fact, the complaint in that case was so bad that, like the complaint at bar, it did not even make clear which defendants were supposed to have committed what acts, or when, or where, those acts were supposed to have been committed. As a result, that complaint was also insufficient. See U.S. v.

40

Private Sanitation Industries Assoc., 793 F. Supp. 1114 (E.D.N.Y., 1992) in which the complaint was so lacking in clarity that, also like the complaint at bar, "it was only through guesswork that one was able to match any numbered racketeering act with any particular defendant" Id. at 1130.

14)     In contrast, in the case of State Farm v. Kalika, 2006 U.S. Dist. Lexis 97459 (E.D.N.Y., 2006), which also involved RICO claims based upon fraudulent billing for no-fault claims, the complaint was held to be sufficient. In that case, however, the plaintiffs did not make broad, vague allegations of fraud. Rather, in Kalika, Supra, State Farm alleged that, for the patients on whom kidney ultrasounds were performed, the defendants misrepresented that the patients had blood in their urine. Further, State Farm also alleged that, for non-kidney patients, the defendants misrepresented the prognosis and treatment plans of patients in order to justify the unnecessary tests performed on them. Finally, State farm alleged that the billing code used by the defendants on the bills they submitted to State Farm misrepresented the type of diagnostic test performed on the patient for whom it was submitted. As a result, the defendants in Kalika, Supra, were given ample notice by State Farm's complaint of both the nature and the basis of the allegations against them. As a result, they were made very aware of both what documentation and what witnesses were likely to be used against them and for what purpose each document and witness against them would be used to establish.

15)     At bar, of course, not only is none of that the case but the exact opposite of that is the case. After all, the plaintiffs do not name a single person who allegedly worked as independent contractors at either Delta or Avalon. They do not provide a date upon which any particular claim billed for is supposed to have been performed by an independent

41

contractor or billed for but not actually performed at all. They do not allege when, or where, Dr. Demarco and Gorshtein and Shusterman hatched their awful plot to defraud the Plaintiffs by using Delta and Avalon to benefit Akkord and Big Apple, and thus Gorshtein and Shusterman. They do not allege a factual basis to support their allegation that Dr. Demarco did not spend much time at Delta or Avalon. They do not allege a factual basis to support their allegation that Dr. Demarco ceded control of the operation and management of Delta and Avalon, etc. As a result, The Demarco defendants are left without any notice whatsoever as to the nature or the basis of the allegations against them. Therefore, the plaintiffs' complaint should be dismissed for failing to meet the pleading requirements as to notice of F.R.C.P. 8(a). <u>Gregoris Motor</u>, <u>Ralston</u>, <u>Private Sanitation</u>, Supra. In addition, of course, the plaintiff's complaint also fails under F.R.C.P. 9(b). <u>Thomason</u>, <u>Wayne Investment</u>, <u>Hayduk</u> and <u>Barthelmes</u>, Supra,

16)   For instance, in <u>Thomason</u>, Supra, it was held that the allegations in Paragraphs 49-51 of the plaintiff's complaint that i) a defendant trustee to a trust fund wrote a check from the fund to his wife; ii) the transaction was a potential conflict of interest that required I.R.S. approval and iii) the trustee hadn't received enough information to properly evaluate the procedure prior to performing it were insufficient to support a cause of action under ERISA because, unlike his appeal brief, the plaintiff's complaint failed to allege any facts as to just why the transaction was improper and, therefore, should not have been approved and that the allegation in Paragraph 59 of the complaint that the defendants were "co-conspirators who willfully, wrongfully and intentionally violated ERISA" was also insufficient to "raise any issues" of [the defendant's alleged fraud]". Similarly, in <u>Hayduk</u>, Supra, Paragraph 23 of the complaint alleged "At places and dates

42

unknown to plaintiff [the defendant] and others conspired and developed a scheme...for the purposes of cheating [plaintiffs out of their corporate and partnership interest]". Further, Paragraph 33 of the plaintiff's complaint alleged "Each of the defendants, by participation in said civil conspiracy to defraud plaintiffs, acted in a way so as to enhance their financial gain".

17)      Like the case at bar, however, none of the allegations in the plaintiff's complaint gave the defendant in Hayduk, Supra, any clue as to just what exactly he supposedly said or did that made up the factual basis of the plaintiff's complaint. Consequently, and also just like the case at bar, it also left the defendant in Hayduk, Supra, with no basis to determine what documents he might examine, what persons (not named in the complaint) of whom he might inquire or what dates on his calendar he might check to try and formulate a defense to the plaintiff's complaint. Moreover, as was the case in both Thomason and Hayduk, Supra, in the case at bar, those allegations in the plaintiffs' complaint that are pled with particularity do not constitute fraud and the allegations in the complaint that do allege fraud lack particularity.

18)      These failings were, of course, fatal to the plaintiff's complaint in both cases since the need to fraud plead allegations with particularity under FRCP 9(b) holds true "even when the fraud relates to matters peculiarly within the knowledge of the opposing party" Id., citing Wayne Investment, v. Gulf Oil Corp., 739 F.2d 11, 13-14 (1ˢᵗ Cir., 1984). In fairness to the plaintiffs in Hayduk, Supra, though, it must be said that at least they were upfront in their complaint about the fact that they did not know anything as to the specifics as to when and where the conspiracy they were alleging actually took place. In this case, not even that much can be said of the plaintiffs' complaint.  In contrast, in

Barthelmes, Supra, the plaintiff alleged that on February 25, 2011, the defendant changed his evaluation from a 6 to a 2 despite the fact that, according to the calibration scorecard upon which the evaluation was based, he should have received at least a 6.

19)    The rest of the plaintiff's pleadings in Barthelmes, Supra, were more general but even they were at least somewhat specific in their assertions that he had been given arbitrary and baseless evaluations throughout 2011 despite his superior work performance, thereby giving the defendant in the case a location where the alleged fraud took place (his place of work) a relatively narrow timeframe in which it took place (2011) and a set of documents to examine in which the fraud is contained (the purportedly false evaluation reports). In the case at bar, by the plaintiffs' own account, none of the records submitted to Allstate by Delta or Avalon show any indication of fraud whatsoever and nowhere in the plaintiffs' complaint in the case at bar is there any reference to any date on which, or any location at which, the Demarco defendants are supposed to have conceived and then carried out their diabolical scheme to defraud Allstate by first having Dr. Demarco fraudulently incorporate Delta and Avalon and then having Gorsthein and Shusterman exercise unlawful control over them while Dr. Demarco had little if anything to do with them.


20)    Based on the arguments above, the plaintiffs' complaint should be dismissed pursuant to FRCP 12(c) due to the plaintiffs' failure to state a cause of upon which relief can be granted due to the failure of Allstate to plead its allegations of fraud with sufficient particularity to satisfy F.R.C.P. 9(b). Id., Thomason, Segal, Era v. Morton, Wayne Investments, and Hayduk, Supra. In fact, the plaintiffs; complaint is so lacking it

44

fails to satisfy even the pleading requirements as to notice of F.R.C.P. 8(a). Bonanno, Ralston, Gregoris Motor and Private Sanitation, Supra.

## POINT VI

PARTIAL SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56(C) IS APPROPRIATE SINCE THE PLAINTIFFS' WILL BE UNABLE TO ESTABLISH THAT THE EQUIPMENT USED BY THE DEFENDANTS IS OBSOLETE DUE TO BEING OUTDATED AND INCAPABLE OF BEING UPGRADED

1)      In the manner explained in Point V, Paragraph 4 above, and therefore not repeated here, the plaintiffs allege that the MRI machine used by the Demarco Defendants is obsolete and incapable of being upgraded. This is simply not true. Rather, as evidenced by the Service Reports by RAB Maintenance, the machine is capable of being upgraded and, in fact, since first being used by Delta and Avalon, has been upgraded (See Exhibit C herein for copies of two (2) Service Reports for the MRI machine used at both Delta and Avalon and the affidavit by Dr. Demarco authenticating the reports). Therefore, since there can be no reasonable dispute that, contrary to the Plaintiffs' complaint, the MRI machine used by the Demarco defendants is not obsolete due to being incapable of being upgraded, Pursuant to F.R.C.P. 56(c), the Demarco defendants are entitled to summary judgment as to that portion of the plaintiffs' complaint that rests on the grounds that the machine is obsolete due to being incapable of being upgraded. Hough v. Local 134, International Electrical Workers, 867 F.2d 1018 (7th Cir., 1988).

## POINT VII

THERE IS NO JUSTICABLE CONTROVERSY BEFORE THE COURT AND, THEREFORE, THE COURT LACKS SUBJECT MATTER JURISDICTION

1)      For the reasons discussed in Points 1-V above, and therefore not repeated here, there is no justicable controversy before the Court and, as a result, the Court does not have subject matter jurisdiction in this matter. Lujan v. Defenders of Wild Life, 504 U.S.

555 (1992) (Complaints that allege no more than general grievances lacking in specificity are insufficient to create a cause or controversy sufficient to sustain a federal complaint).

2)      Based on the arguments above, the plaintiffs' complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) due to the lack of a justicable controversy before the Court for which relief can be granted. Id.

POINT VIII

THE FEDERAL COURT LACKS ORIGINAL JURISDICTION, AS SUCH, THECOURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION

1)      Plaintiff's Complaint, at ¶38 purports to set forth this Court's jurisdictional authority, to wit, 28 U.S.C. §1331, which grants federal courts jurisdiction over "any civil action arising under the constitution, laws or treaties of the United States" (i.e., the RICO statute: 18 U.S.C. § 1961). Plaintiffs further claims that this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367 (which gives a federal district court jurisdiction over state causes of action if "these are so related to the RICO claims as to form part of the same cases and controversy." ) Complaint, ¶39.

2)      As more fully set out in Point V above, the RICO claim should be dismissed pursuant to Fed. R. Civ. Pro. 12(c) for failure to state a claim. Therefore, even if the Plaintiffs' Non-RICCO claims weren't invalid for the reason explained in Points I to IV above (which they are), pursuant to §1367(c)(3), this Court may decline to exercise supplemental jurisdiction. In the absence of original jurisdiction pursuant to 28 U.S.C. §1331, the district court is divested of the original jurisdiction necessary to support supplemental jurisdiction. "The exercise of supplemental jurisdiction is left to the discretion of the district court . . . if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well". First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004) In fact, in First Capital, Supra, which was a RICO case with state claims similar to the litigation at bar, the Court reasoned that the dismissal of the state claims in

46

the case was especially appropriate in light of the fact that the Complaint was dismissed at a similar stage in the litigation as the case at bar, or, as the Court put it "... well before trial, and for that matter, even before significant discovery had taken place." Id. at 182.

### CONCLUSSION

The plaintiffs' have failed to state a cause of action upon which relief can be granted and as a result, there is no justicable controversy before the Court. Therefore, the defendants' motion dismissing the plaintiffs' complaint should clearly be granted in its entirety.

Further, all discovery, including compliance with subpoenas, should be stayed pending the outcome of the within motion (See Proposed Order enclosed as Exhibit C).

Dated:  December 10, 2015
       Brooklyn, NY

                    LAW OFFICE OF DAVID O'CONNOR, ESQ.

                    *David O'Connor, Esq.*

                    By: David O'Connor, Esq. (0790)
                    Attorney for Defendants
                    807 Kings Highway, 2nd Floor
                    Brooklyn, NY 11223
                    718-517-2322

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE INDEMNITY COMPANY,<br>ALLSTATE PROPERTY & CASUALTY INSURANCE<br>COMPANY,<br>ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,<br>AND<br>ALLSTATE VEHICLE & PROPERTY INSURANCE<br>COMPANY,<br><br>       Plaintiffs,<br><br>vs.<br><br>CHARLES J. DEMARCO, M.D.,<br>DELTA DIAGNOSTIC RADIOLOGY, P.C.,<br>AVALON RADIOLOGY, P.C.,<br>EDWARD GORSHTEIN,<br>LEONID SHUSTERMAN,<br>AKKORD MANAGING SERVICES, INC., AND<br>BIG APPLE MANAGING SERVICES. INC.,<br><br>       Defendants. | C.A. No. |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

## I.     INTRODUCTION

1.     This action involves numerous individuals and entities that have banded together to defraud Allstate and to exploit both New York and federal law through (a) the unlawful management and control of two purportedly physician-owned professional corporations, and (b)

1

the submission to Allstate of hundreds of fraudulent charges for diagnostic radiology services—i.e., magnetic resonance imaging ("MRI") studies. These diagnostic radiology services were purportedly provided to individuals involved in automobile accidents who were eligible for coverage under an insurance policy issued by Allstate ("Insureds").

2.      Defendants, Delta Diagnostic Radiology, P.C. ("Delta") and Avalon Radiology P.C. ("Avalon") (collectively, "PC Defendants"), were purposely used as the vehicles through which the defendants submitted the fraudulent claims. As explained below, Delta and Avalon are not—and, in fact, have never been—eligible to seek or recover No-Fault reimbursement payments from Allstate because:

      a)     The PC Defendants are unlawfully owned and controlled by one or more non-physician;

      b)     The PC Defendants billed Allstate for diagnostic radiology services that were performed by independent contractors and not persons actually employed by the PC Defendants;

      c)     The purported sole officer, director, and shareholder of the PC Defendants, Charles J. DeMarco, M.D. ("DeMarco"), does not actually practice medicine through either Delta or Avalon; and

      d)     The PC Defendants were purposely and knowingly caused to unlawfully split the PC Defendants' professional fees and profits with one or more non-physician.

3.      The PC Defendants were also purposely and knowingly caused to seek reimbursement from Allstate in connection with claims that were non-compensable under

2

prevailing New York law because the underlying diagnostic radiology services were not lawfully rendered and/or were of no medical or diagnostic value.

4.      At all relevant times, defendants Edward Gorshtein ("Gorshtein"), Leonid Shusterman ("Shusterman"), Akkord Managing Services, Inc. ("Akkord"), and Big Apple Managing Services, Inc. ("Big Apple") (collectively, "Management Defendants")—none of whom are licensed physicians or are lawfully authorized to control, manage, or share in the professional fees and profits of physician-owned professional corporations—purposely and knowingly conspired with DeMarco to unlawfully operate Delta and Avalon in direct violation of prevailing New York and federal law.

5.      At all relevant times and as a key part of this scheme, DeMarco purported to serve as the sole officer, director, and shareholder of Delta and Avalon. In reality, however, the Management Defendants actually managed and controlled the PC Defendants, and used a series of arrangements with DeMarco and the PC Defendants to unlawfully channel the professional fees and profits of Delta and Avalon to themselves.

6.      As detailed below, the Management Defendants schemed to defraud Allstate by:

    a)      Causing DeMarco to incorporate the PC Defendants although DeMarco did not practice medicine through either Delta or Avalon;

    b)      Requiring DeMarco to enter into a series of one-sided arrangements governing the operation and management of the PC Defendants by the Management Defendants, including those governing the use of space and MRI equipment;

    c)      Exerting control over the day-to-day operation and management of Delta and Avalon;

3

d) Hiring independent contractors to perform diagnostic radiology services, and then purposely and intentionally causing the PC Defendants to seek reimbursement for such services as if the services had been provided by an owner or employee of the PC Defendants;

e) Using the façade of the PC Defendants and their connections with Akkord and Big Apple to purposely and knowingly conceal the truth that the PC Defendants were unlawfully controlled by the Management Defendants;

f) Causing the PC Defendants to bill Allstate for reimbursement on assigned No-Fault claims even though the PC Defendants were never legally entitled to pursue, collect, or retain such reimbursement; and

g) Causing the PC Defendants to bill Allstate for diagnostic radiology services that were non-compensable because they were not lawfully rendered, if at all.

7. As detailed below, the PC Defendants never had any right to be compensated for any of the billed-for services purportedly provided to Allstate Insureds.

8. As a result of the defendants' fraudulent scheme, Allstate has been damaged in excess of $2,509,527.00, representing "No-Fault" insurance payments that Allstate was wrongly induced to make in connection with the PC Defendants' reimbursement demands.

9. This action seeks the recovery of all such monies that Allstate was wrongfully induced to pay to the PC Defendants.

10. This action also seeks a declaration that Allstate is not legally obligated to pay any and all previously-denied and/or currently unpaid claims submitted by (or on behalf of) the PC Defendants because the services purportedly rendered to Allstate Insureds were rendered in direct violation of one or more New York State licensing requirements necessary to provide such

4

services, thus rendering the PC Defendants completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

11.     Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted hundreds of bills for health care services purportedly rendered to persons eligible for insurance coverage under Allstate insurance policies.

12.     By this Complaint, Allstate brings this action against the above-captioned defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; (c) unjust enrichment; and (d) declaratory relief.

13.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

14.     The defendants' insurance fraud scheme was purposely designed and executed to elicit payment of automobile insurance contract proceeds from Allstate to the defendants.

15.     In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which defendants perpetrated their scheme to defraud.

16.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

## II.     THE PARTIES

### A.     PLAINTIFFS

17.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle

& Property Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal places of business in Northbrook, Illinois.

18.    At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company were each authorized to conduct business in New York.

**B.    DEFENDANTS**

19.    DeMarco is a physician who has been licensed to practice medicine in New York since 1989.

20.    DeMarco resides in and is a citizen of the State of New York.

21.    Delta is a New York professional service corporation with its principal place of business located at 61 Avenue U, Brooklyn, New York.

22.    Delta also purports to operate out of an office space located at 275 Avenue X, Brooklyn, New York.

23.    At all relevant times, DeMarco falsely purported to be the sole officer, director, and shareholder of Delta.

24.    At all relevant times, and in direct violation of N.Y. Bus. Corp. Law § 1508, Delta was unlawfully operated and controlled by one or more non-physician, and was therefore ineligible to collect payments pursuant to N.Y. Ins. Law § 5102.

25.    Avalon is a New York professional service corporation with its principal place of business located at 2085 West 11th Street, Brooklyn, New York.

26.    From at least 2012 through the present, DeMarco falsely purported to be the sole officer, director, and shareholder of Avalon.

6

27.     From at least 2012 to the present, and in direct violation of N.Y. Bus. Corp. Law § 1508, Avalon was unlawfully operated and controlled by one or more non-licensed layperson, and was therefore ineligible to collect payments pursuant to N.Y. Ins. Law § 5102.

28.     Gorshtein resides in and is a citizen of New York.

29.     Gorshtein has never been licensed to provide professional health care services.

30.     Shusterman resides in and is a citizen of Pennsylvania.

31.     Shusterman has never been licensed to provide professional health care services.

32.     Big Apple is a domestic business corporation with a principal place of business at 275 Avenue X, 2nd Floor, Brooklyn, NY.

33.     Gorshtein is registered as the CEO of Big Apple.

34.     During the relevant period, Gorshtein and Shusterman knowingly used Big Apple to unlawfully operate one or more of the PC Defendants and to unlawfully share in the professional physician fess and profits collected by the PC Defendants.

35.     Akkord is a domestic business corporation with a principal place of business at 61 Avenue U, Brooklyn, New York.

36.     Both Gorshtein and Shusterman are executive officers of Akkord.

37.     During the relevant period, Gorshtein and Shusterman purposely used Akkord to unlawfully operate one or more of the PC Defendants and to unlawfully share in the professional physician fees and profits collected by the PC Defendants.

III.    **JURISDICTION AND VENUE**

38.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

7

39.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

40.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

41.     At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws (as detailed *infra*).

42.     The defendants' activities in and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

43.     As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

IV.     **APPLICABLE LAWS AND REGULATIONS**

    A.     **NEW YORK'S NO-FAULT LAWS AND RELEVANT LICENSING PROVISIONS**

44.     Allstate underwrites automobile insurance in the State of New York.

45.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

46.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11

N.Y.C.R.R. § 65, *et seq.*) (collectively, "the No-Fault Law"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter "No-Fault Benefits") to Allstate claimants.

47.     Under the New York No-Fault Law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

48.     "Basic economic loss" is defined to include "all necessary expenses" for medical services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

49.     No-Fault Benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary health care goods and services.

50.     A patient can assign his/her No-Fault Benefits to health care service providers.

51.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

52.     Pursuant to N.Y. Ins. Law § 403(d), NF-3s must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime…

53.     NF-3 forms are important documents in the insurance industry.  They certify that the provider's request for payment is not materially false, misleading, or fraudulent.  11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

54.    It is a material misrepresentation to submit NF-3 forms for treatment, testing, and other services that: (a) are never provided; or (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided.

55.    In New York, only a licensed physician may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable in this case—economic benefit from physician services.

56.    New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

57.    New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

58.    New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

59.    Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

60.     Under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

61.     Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

62.     In New York, insurers may seek affirmative recovery against individuals and entities that have violated the above statutes and regulations.

63.     In *State Farm v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional health care services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional health care services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

64.     In the matter *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term 2d Dep't 2006), it was held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

65.     As detailed below, the defendants purposely and knowingly violated one or more of the above-cited New York statutes and regulations through the operation and management of Delta and Avalon.

**B.     THE WORKERS' COMPENSATION FEE SCHEDULE AND RADIOLOGY GROUND RULES**

66.     To regulate the fees charged by health care providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

67.     The Fee Schedule is used by health care providers and insurers to determine the level of reimbursement payable on legitimate claims.

68.     Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for...medical...surgical...physical therapy...[and] any other professional health services."

69.     In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

70.     Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault Laws] and the workers' compensation law with respect to the charges for the professional health services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

71.     The Fee Schedule regarding radiology services sets forth specific ground rules that health care providers are required to follow when seeking reimbursement from insurers for such services.

72.     The Fee Schedule, Ground Rule 6, entitled "Specific Billing Instructions," states that the "listed values are for the technical component plus the professional component" of the services and indicates that "total reimbursement for the professional and technical components shall not exceed the listed value for the total procedure, regardless of sites where the services are rendered."

73.     Ground Rule 6 defines the "professional component" as the value of the professional radiological services provided by the physician, including reading the film and preparing a report.  Ground Rule 6 further defines the "technical component" as the charges for the performance of the actual procedure (i.e., the actual scan using the MRI equipment).

74.     Within the radiology section of the Fee Schedule, each Current Procedure Terminology ("CPT") code allocates a certain percentage of each service to the technical component and a certain percentage to the professional component.

75.     For example, if a health care provider were to bill an insurer for performing a lumbar MRI using CPT code 72148, twenty percent (20%) of the charges would be allocated to the professional component and eighty percent (80%) of the charges would be allocated to the technical component.

76.     If that health care provider resided in Region 4 (where Delta and Avalon purported to render radiology services), and billed for the performance of a lumbar MRI at $912.00 (per the Fee Schedule), only $182.40 of the charge would be reimbursable for services rendered by the physician (i.e., the professional component).  The remaining 80% ($729.60) would be reimbursable to the individual or entity that performed the technical component.

77.     At all relevant times, the PC Defendants routinely, purposely, and knowingly billed Allstate for the professional component and the technical component of the MRI services

13

purportedly provided even though no owner or employee or Delta or Avalon played any role in the actual taking of the MRI image (i.e., the technical component).

## V.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

78.    New York's No-Fault system is designed to provide patients and health care providers with compensation for the provision of health care services, and is also designed to require prompt payment of patient claims.

79.    As a result, the submission of bills by health care service providers for facially-valid services often will result in prompt payment from a No-Fault insurer.

80.    However, New York's No-Fault laws and enacting regulations are clear that providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet *any* New York State or local licensing requirement necessary to perform such service in New York.

81.    As explained below, at all relevant times, the defendants have taken advantage of New York's No-Fault system by (a) operating the PC Defendants in violation of one or more applicable New York state licensing requirements governing the provision of professional health care services, and (b) in certain instances, creating and submitting (or causing to be created and submitted) to Allstate false and fraudulent reports and invoices demanding payment pursuant to New York's No-Fault laws.

82.    The defendants, at all times relevant, knew that (a) the PC Defendants were actually controlled by one or more non-physician, and (b) the PC Defendants were caused to unlawfully split professional physician fees and profits with one or more non-physician.

83.     The Management Defendants' control over the PC Defendants compromised patient care, as the provision of health care services by the PC Defendants was subject to the pecuniary interests of one or more non-physician.

84.     The defendants, at all relevant times, also knew that the bills submitted to Allstate were non-compensable because the underlying MRI services were not lawfully rendered, if at all, in accordance with the standard of care.

85.     The defendants' purported provision of MRI services to Allstate insureds jeopardized patient health and safety, as the results of such MRI services were used to guide the course of patient treatment.

86.     Further, the defendants, at all relevant times, knew that the bills submitted to Allstate were non-compensable because: (a) the sole physician-owner of the PC Defendants, DeMarco, did not actually practice medicine through either Delta or Avalon; and (b) the radiology services were performed by independent contractors.

87.     Because the PC Defendants were (a) unlawfully operated and controlled by one or more non-physician; and (b) used as a conduit to unlawfully split fees with one or more non-physician, the PC Defendants were operated in violation of New York law, thus rendering both Delta and Avalon completely ineligible for No-Fault reimbursement under Insurance Law § 5102(a)(1).

88.     To commence this scheme, Gorshtein and Shusterman purposely and knowingly conspired with DeMarco to have DeMarco—albeit facially—act as the sole officer, director, and shareholder of Delta.

89.    DeMarco was the perfect figurehead for this scheme because he had been subject to professional discipline in New York and New Jersey, thus limiting his prospects for legitimate employment. *See* DeMarco Disciplinary Records, attached as Exhibit 1.

90.    Once formed with DeMarco as the nominal physician-owner, Delta was purposely and knowingly used as a conduit to collect No-Fault benefits for health care services purportedly rendered through Delta, even though Delta was, in reality, controlled by one or more non-physician.

91.    Throughout the course of this scheme, control of Delta has been ceded unlawfully to the Management Defendants, who used the façade of Delta to do indirectly what they were forbidden from doing directly, namely: (a) controlling physician-owned professional corporations; and (b) charging for (and deriving an economic benefit from) the purported provision of physician services.

92.    As a means to further this scheme, in 2012, Gorshtein and Shusterman further conspired with DeMarco to have DeMarco to incorporate and serve as the nominal physician-owner of another professional corporation—Avalon.

93.    To create the false appearance that Avalon was a separate and distinct entity, the defendants simply set up Avalon on the other side of the building where Delta maintained its operation.

94.    The defendants then purposely and knowingly used Avalon as another means to collect No-Fault benefits for health care services purportedly rendered through Avalon, even though Avalon was, in reality, controlled by one or more non-physician.

95.    From its inception, control of Avalon has been ceded unlawfully to the Management Defendants, who used the façade of Avalon to do indirectly what they were

16

forbidden from doing directly, namely: (a) controlling the practices of a licensed physician; and (b) charging for (and deriving an economic benefit from) DeMarco's purported provision of physician services.

96.     As part of the scheme, DeMarco permitted Gorshtein and Shusterman, acting through Big Apple and Akkord, to exercise dominion and control over the PC Defendants, including Delta's and Avalon's No-Fault receivables.

97.     DeMarco also allowed Gorshtein and Shusterman, acting through Big Apple and Akkord, to administer the day-to-day operation, management, and/or control of Delta and Avalon.

### A.     THE UNLAWFUL OPERATION AND CONTROL OF DELTA AND AVALON

98.     Once DeMarco agreed to organize Delta, Gorshtein and Shusterman caused DeMarco, on behalf of Delta, to enter into a series of arrangements with Big Apple, and later with Akkord.

99.     These arrangements caused Delta to pay exorbitant sums in purported "rent" and other expenses to the Management Defendants for the use of space and equipment, including an MRI machine.

100.    The MRI machine used by Delta and Avalon at the 61 Avenue U/2085 West 11th Street facility (i.e., Hitachi MRP 5000 scanner), however, is obsolete and incapable of producing scans of any medical or diagnostic value.

101.    The Hitachi MRP 5000 scanner, which has not been manufactured since 1994, has a ten year life span and cannot be upgraded.

102.    In 2004, toward the end of the unit's life, the Hitachi MRP 5000 scanner only had an actual market value of no more than $12,000.00 to $60,000.00.

103.    Because MRI equipment depreciates significantly with each year of successive use, virtually any amount in monthly "rent" charged by the Management Defendants for Delta's "use" of the Hitachi MRP 5000 scanner was excessive, as the equipment was utterly worthless and of no diagnostic utility.

104.    Upon information and belief, Delta was also obligated to pay the Management Defendants grossly excessive fees for a number of other services, including administrative services, personnel, technicians, and billing and collections services.

105.    The amounts charged by the Management Defendants for these services far exceeds any reasonable market value, and the amounts charged were simply used as means to mask the fact that the Management Defendants were unlawfully siphoning the professional physician fees and profits from Delta.

106.    To further their scheme, the Management Defendants also used certain arrangements to exert unlawful control over Avalon.

107.    In addition to these arrangements, the Management Defendants selected a location conducive to furthering this scheme.

108.    To conceal their conduct and to further their scheme, the defendants intentionally manipulated the addresses of Delta and Avalon to purposely and knowingly create the false appearance that Delta and Avalon were wholly separate entities that operated from different locations.

109.    Specifically, Delta was caused to operate from the 61 Avenue U, Brooklyn, New York location even though Delta's public filings with the State of New York indicate that Delta's principal place of operation was at 275 Avenue X, Brooklyn, New York—a location with no known diagnostic radiology equipment, including an MRI scanner..

110.    Delta's use of the Avenue U facility is significant because the MRI machine used at the 61 Avenue U location is utterly obsolete and incapable of producing images of any diagnostic value.

111.    Notably, Delta has been caused to continually operate from the 61 Avenue U location, and at all times, has used this obsolete MRI equipment to provide radiology services to Allstate Insureds.

112.    To further their scheme, defendants later caused the creation of Avalon.

113.    While Avalon continued to use the same obsolete MRI equipment, the defendants took purposeful steps to conceal this fact by listing Avalon's registered address with the NYS Department of State and Office of the Professions as 2085 West 11th Street, Brooklyn, New York—a street address that appears unrelated, but in reality, is simply located on the west side of the building located at 61 Avenue U.

114.    The defendants also took purposeful steps to create the illusion that the PC Defendants and the Management Defendants' entities (i.e., Big Apple and Akkord) were separate and distinct entities with different places of business.

115.    First, Big Apple was caused to register its corporate address as 275 Avenue X, 2nd Floor, Brooklyn, New York 11223.

116.    Notably, while Delta's public filings made it seem that Delta was associated only with the 275 Avenue X address, no such diagnostic imaging services were conducted at this address—all such services were actually rendered at the 61 Avenue U location.

117.    Further, although Akkord's New York State Department of State Service of Process address is listed as 61 Avenue U, Unit A, Brooklyn, New York 11223, Delta's bills routinely represent its service address as 61 Avenue U, Unit B, Brooklyn, New York 11223.

118.    Notably, there are no separate "units" at the 61 Avenue U location, and defendants' representations regarding where Akkord and Delta conducted business were intended solely to create the illusion that Delta and Akkord did not share the same physical space—which they have throughout the course of this scheme.

119.    Additionally, before being taken out of service, the telephone numbers for both Akkord and Delta differed by only one digit, and when called in a consecutive manner, the same individual answered both lines with the same non-specific greeting" "MRI, can I help you?"

120.    As a further part of this scheme, the defendants conspired to falsely represent to Allstate that DeMarco performed the physical MRI scans and interpreted the films for virtually every single claim.

121.    DeMarco, however, did not actually perform each of the services for which the PC Defendants billed; rather, such services, in many instances, were performed by independent contractors rather than an owner or employee of Delta or Avalon.

122.    DeMarco rarely visits the 61 Avenue U/2085 West 11th Street facility, thus rendering false the representations that DeMarco actually provided the diagnostic imaging services for which Allstate was billed.

123.    Because DeMarco rarely, if ever, was actually present at the 61 Avenue U/2085 West 11th Street facility, it was utterly impossible for DeMarco to hire, supervise, and/or train the persons who actually provided the imaging services to Allstate Insureds.

124.    Moreover, because most of Delta's and Avalon's reports and invoices bear DeMarco's electronic signature or stamp, it is questionable whether DeMarco ever actually reviewed or signed the reports and invoices.

125.    In fact, some of the documentation submitted to Allstate by Delta and/or Avalon simply contains no form of signature whatsoever.

126.    DeMarco's purposeful and knowing decision to relinquish control of the PC Defendants to one or more non-physicians caused both Delta and Avalon to be operated in direct violation of one or more state law or regulation pertaining to the operation of a physician-owned professional corporation, thus rendering both Delta and Avalon completely ineligible for reimbursement under New York's No-Fault law.

**B.    DeMarco's Failure to Engage in the Practice of Medicine Through Delta and Avalon**

127.    Business Corporation Law § 1507 requires a shareholder physician of a medical corporation to actually be engaged in the practice of medicine through the professional corporation.

128.    DeMarco never significantly engaged in the practice of medicine through either of the PC Defendants.

129.    As part of this scheme, DeMarco simply served as nominal owner of Delta and Avalon.

130.    DeMarco played little-to-no role in the services purportedly provided through Delta and Avalon, and was rarely physically present at the 61 Avenue U/2085 West 11th Street facility, thus making it impossible for DeMarco to adequately supervise the provision of medical services purportedly provided to Delta and/or Avalon patients.

131.    Despite his virtual absence, DeMarco is listed on a multitude of bills and MRI reports submitted to Allstate as the individual who physically performed the MRI scans (i.e., the technical component) and who interpreted the film (i.e., the professional component).

21

132.    Numerous bills submitted by the PC Defendants to Allstate for reimbursement were not was actually signed by DeMarco.

133.    Likewise, most, if not all, of the assignment of benefit forms relating to the health care services purportedly provided by the PC Defendants did not bear DeMarco's actual signature.

134.    Rather, these forms bear only DeMarco's electronic signature, which was likely placed on the forms by the Management Defendants or persons under their control.

135.    DeMarco's limited participation in the PC Defendants' operation establishes that DeMarco was not engaged in the practice of medicine through Delta or Avalon as required by New York Law.  New York Business Corporation Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation.

136.    Prevailing New York law is clear that a professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation...or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued... All shares issued, agreements made, or proxies granted in violation of this section shall be void.

137.    The statute's legislative history confirms that the physician must not only be licensed to practice, but must also be engaged in the practice of medicine in a medical professional corporation.

138.    For example, the New York State Education Department stated on June 15, 1971 in its recommendation regarding the amendment to the Business Corporation Law (S 5399-C):

This bill amends the Business Corporation Law in relation to the operation of professional service corporations. While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

139.    Similarly, the New York Department of State commented in a letter dated June 24, 1971 to Counsel to the Governor regarding the bill amending the Business Corporation Law (S 5399-C) that:

Section 1507 currently limits issuance of shares in such a corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity. The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

140.    New York's Department of Health was of the same opinion in a letter dated June 24, 1971 to Counsel to the Governor regarding S 5399-C, commenting that:

The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged.

141.    Further, while N.Y. Educ. Law § 6521 defines the practice of medicine as "diagnosing...any human disease, pain, injury, deformity or physical  condition," the MRI machine purportedly used by DeMarco in the purported treatment of Delta and Avalon patients, as detailed above, is wholly incapable of producing scans of any diagnostic or medical utility.

142.    Overall, the actual operation of Delta and Avalon make clear that DeMarco played no meaningful role, if any, in the day-to-day operation of Delta and Avalon at their actual places of business at the 61 Avenue U/2085 West 11th Street location.

23

143.    DeMarco's failure to engage in the practice of medicine through Delta or Avalon—as well as his failure to supervise any technicians or other individuals who perform services on behalf of Delta or Avalon—compromised patient care and resulted in unnecessary and/or worthless diagnostic testing.

144.    Whereas both Delta's and Avalon's operation were always subject to the pecuniary interests of one or more non-physicians, and not the independent medical judgment of a licensed doctor, both Delta and Avalon lacked reimbursement eligibility under New York's No-Fault laws.

## VI.    UNLAWFUL BILLING FOR SERVICES RENDERED BY INDEPENDENT CONTRACTORS

145.    To be eligible for reimbursement under the No-Fault Laws, a professional corporation is entitled to payment from an insurer only if, *inter alia*, the professional corporation—through an owner or employee thereof—is the actual provider of the billed-for services.

146.    A health care provider's use of independent contractors, rather than employees, to provide health services renders the provider ineligible to receive reimbursement under the No-Fault Laws. *See* DOI Opinion Letter, dated February 21, 2001, attached hereto as Exhibit 2.

147.    Throughout the scheme, the bills submitted by Delta and Avalon include charges for services provided by independent contractors.

148.    On virtually every assignment of benefits form, MRI interpretive report, and bill submitted by Delta and Avalon to Allstate, DeMarco is identified as both the individual who rendered the radiology services and the individual who reviewed and interpreted the radiology films.

149.    In reality, however, the persons who actually administered the scans (i.e., the technical component of the scans) were not employed by Delta or Avalon.

150.    Thus, even assuming that DeMarco happened to interpret the scans at an off-site location (i.e., the professional component), neither Delta nor Avalon was permitted to charge for the technical component of the services as if DeMarco or a Delta/Avalon employee had performed the service.

151.    The technicians—who are not actually employed by Delta, Avalon, or DeMarco—render the technical component of the radiology services, and then electronically transmit the information and results to DeMarco at his home or office.

152.    Because the technical component of these services was rendered by independent contractors, neither Delta nor Avalon was ever the direct provider of the health care services that were billed to Allstate.

153.    Accordingly, in all such instances, Delta and Avalon were completely ineligible to receive reimbursement for those billed-for services under New York's No-Fault laws.

## VII.    THE DEFENDANTS' PROVISION OF AND BILLING FOR FRAUDULENT MRI SERVICES

154.    As stated above, the MRI testing provided by the defendants through the PC Defendants was fraudulent and non-compensable under New York's No-Fault Laws because the equipment used to conduct the tests—the Hitachi MRP 5000—is outdated and incapable of producing scans of any diagnostic quality.

155.    Specifically, the Hitachi MRP 5000 machine used by Delta and Avalon at the 61 Avenue U/2085 West 11th Street facility was manufactured in 1994, and has a lifespan of ten (10) years, at most.

25

156.    While some MRI machines are capable of being ungraded to a current production model, the Hitachi MRP 5000 is not.

157.    Thus, for the Hitachi MRP 5000 located at the 61 Avenue U/2085 West 11th Street facility to be used in any meaningful or functional diagnostic capacity, the entire magnet would have to be replaced.

158.    However, upon information and belief, the magnet housed in the Hitachi MRP 5000 machine at the 61 Avenue U/2085 West 11th Street facility has never been replaced at any time during the course of this scheme.

159.    Thus, the MRI machine used to test Delta and Avalon patients was essentially rendered obsolete in or around 2004, and, as of today, has no place in patient care or the performance of legitimate diagnostic testing services.

160.    Further, the quality of the images produced by the defendants' Hitachi MRP 5000 machine are worthless and of no diagnostic utility.

161.    In fact, the images captured by this obsolete machine often contain a tremendous amount of "artifacts"—objects which appear in a scanned image that are not actually present in the original image.

162.    The presence of these artifacts results in a worthless image wholly devoid of any diagnostic quality

163.    Thus, the continued use of this obsolete machine resulted in MRI services that were grossly below the standard of care, while also compromising patient health and safety.

164.    Accordingly, in every case where this obsolete machine was used, the resulting image was of no diagnostic value, and each of Delta's and Avalon's charges based on the use of

26

this arcane machinery render each such charge non-compensable under New York's No-Fault Laws.

## VIII.  <u>SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY</u>

165.    Throughout the course of this entire scheme, DeMarco, Gorshtein, and Shusterman created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

166.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

167.    Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

### A.    <u>DELTA ENTERPRISE</u>

168.    DeMarco, Gorshtein, and Shusterman either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Delta to be mailed to

27

Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

169.    DeMarco, Gorshtein, and Shusterman caused Delta to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time Delta mailed a demand for payment (i.e., invoice) to Allstate.

170.    Gorshtein's and Shusterman's management and control of Delta, combined with Gorshtein's and Shusterman's unlawful receipt of Delta's professional physician fees and profits, rendered Delta completely ineligible for No-Fault reimbursement under New York law.

171.    Because Delta was, in fact, unlawfully controlled by Gorshtein and Shusterman (both non-physicians), DeMarco, Gorshtein, and Shusterman purposely caused Delta to make a misrepresentation each and every time Delta mailed a document to Allstate claiming eligibility for reimbursement.

172.    Moreover, because (a) Gorshtein and Shusterman unlawfully controlled Delta, (b) DeMarco, Gorshtein, and Shusterman caused Delta to seek No-Fault reimbursement from Allstate (even though Delta was not lawfully entitled to such reimbursement), and (c) Delta used the U.S. Mail to seek reimbursement, it is clear that DeMarco, Gorshtein, and Shusterman committed mail fraud.

173.    At all relevant times, DeMarco, Gorshtein, and Shusterman knew that Delta, Gorshtein's and Shusterman's management companies (i.e., Big Apple and Akkord), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by Delta.

174.    Allstate estimates that the unlawful operation of the Delta enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 3 and incorporated herein by reference as if set forth in its entirety.

### B.    AVALON ENTERPRISE

175.    DeMarco, Gorshtein, and Shusterman either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Avalon to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

176.    DeMarco, Gorshtein, and Shusterman caused Avalon to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time Avalon mailed a demand for payment (i.e., invoice) to Allstate.

177.    Gorshtein's and Shusterman's management and control of Avalon, combined with Gorshtein's and Shusterman's unlawful receipt of Avalon's professional physician fees and profits, rendered Avalon completely ineligible for No-Fault reimbursement under New York law.

178.    Because Avalon was, in fact, unlawfully controlled by Gorshtein and Shusterman (both non-physicians), DeMarco, Gorshtein, and Shusterman purposely caused Avalon to make a misrepresentation each and every time Avalon mailed a document to Allstate claiming eligibility for reimbursement.

179.    Moreover, because (a) Gorshtein and Shusterman unlawfully controlled Avalon, (b) DeMarco, Gorshtein, and Shusterman caused Avalon to seek No-Fault reimbursement from Allstate (even though Avalon was not lawfully entitled to such reimbursement), and (c) Avalon

used the U.S. Mail to seek reimbursement, it is clear that DeMarco, Gorshtein, and Shusterman committed mail fraud.

180.   At all relevant times, DeMarco, Gorshtein, and Shusterman knew that Avalon, Gorshtein's and Shusterman's management companies (i.e., Big Apple and Akkord), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by Avalon.

181.   Allstate estimates that the unlawful operation of the Avalon enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 4 and incorporated herein by reference as if set forth in its entirety.

## IX.   SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.   FRAUDULENT CONCEALMENT OF GORSHTEIN'S AND SHUSTERMAN'S UNLAWFUL CONTROL OF THE DELTA ENTERPRISE

182.   Gorshtein and Shusterman induced DeMarco to register himself with the State of New York as Delta's sole officer, director, and shareholder.

183.   The documents created and filed with the State of New York related to Delta deliberately omitted any reference to Gorshtein's and Shusterman's or their management companies' involvement with DeMarco or Delta.

184.   The documents created and filed with the State of New York related to Delta gave no indication to Allstate or the general public that Gorshtein and/or Shusterman in any way maintained a controlling interest in Delta.

30

185.    Based on the representations contained within the four corners of the documents filed with State of New York on behalf of Delta, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Gorshtein's and Shusterman's domination of and control over DeMarco and Delta.

186.    Gorshtein's, Shusterman's, and DeMarco's purposeful concealment of Gorshtein's and Shusterman's controlling interest in Delta allowed Gorshtein and Shusterman to unlawfully control Delta undetected.

187.    At all relevant times during the operation of the Delta enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Delta, Gorshtein, Shusterman, and DeMarco caused Delta to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

188.    Through their role as the owners/operators of Big Apple and Akkord, Gorshtein and Shusterman directly participated in the operation and control of Delta, and thus caused Delta to falsely claim eligibility for No-Fault reimbursement.

189.    Further, DeMarco attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Delta patients, as well as the validity of the charges for such services.

190.    At all relevant times, DeMarco, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

191.    At all relevant times, Gorshtein, Shusterman, and DeMarco actively concealed from Allstate facts regarding Delta's true ownership and control to prevent Allstate from

discovering that Delta was unlawfully incorporated, owned, and controlled by non-physicians, and therefore ineligible to bill for or collect No-Fault benefits.

192.   Many of these facts—particularly Delta's unlawful splitting of professional physician fees and profits with Gorshtein, Shusterman, Big Apple, and Akkord—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

193.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

194.   Thus, every time Gorshtein, Shusterman, and DeMarco (along with those individuals working under their control) caused Delta to submit No-Fault reimbursement demands to Allstate, Gorshtein, Shusterman, and DeMarco (and those individuals working under their control) necessarily certified that Delta was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

195.   The full extent of Gorshtein's, Shusterman's, and DeMarco's fraudulent and unlawful acts relative to their control over the Delta enterprise—including (a) Gorshtein's and Shusterman's involvement in the operation and control of Delta, and (b) the unlawful channeling of Delta's professional proceeds to Gorshtein and Shusterman through the agreements that Big Apple and Akkord maintained with DeMarco and Delta was not, and could not have been, known to Allstate until it commenced this action.

**B.    FRAUDULENT   CONCEALMENT   OF   GORSHTEIN'S   AND   SHUSTERMAN'S
UNLAWFUL CONTROL OF THE AVALON ENTERPRISE**

196.    Gorshtein and Shusterman induced DeMarco to register himself with the State of

New York as Avalon's sole officer, director, and shareholder.

197.    The documents created and filed with the State of New York related to Avalon

deliberately omitted any reference to Gorshtein's and Shusterman's or their management

company's (i.e., Akkord) involvement with DeMarco or Avalon.

198.    The documents created and filed with the State of New York related to Avalon

gave no indication to Allstate or the general public that Gorshtein and/or Shusterman in any way

maintained a controlling interest in Avalon.

199.    Based on the representations contained within the four corners of the documents

filed with State of New York on behalf of Avalon, Allstate—even acting with reasonable

diligence—could not possibly have discovered the nature and extent of Gorshtein's and

Shusterman's domination of and control over DeMarco and Avalon.

200.    Gorshtein's,   Shusterman's,   and   DeMarco's   purposeful   concealment   of

Gorshtein's and Shusterman's controlling interest in Avalon allowed Gorshtein and Shusterman

to unlawfully control Avalon undetected.

201.    At all relevant times during the operation of the Avalon enterprise, to induce

Allstate to pay promptly charges for health care services purportedly provided to patients who

treated at Avalon, Gorshtein, Shusterman, and DeMarco caused Avalon to falsely certify that it

was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

202.    Through their role as the owners/operators of Akkord, Gorshtein and Shusterman

directly participated in the operation and control of Avalon, and thus caused Avalon to falsely

claim eligibility for No-Fault reimbursement.

203.    Further, DeMarco attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Avalon patients, as well as the validity of the charges for such services.

204.    At all relevant times, DeMarco, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

205.    At all relevant times, Gorshtein, Shusterman, and DeMarco actively concealed from Allstate facts regarding Avalon's true ownership and control to prevent Allstate from discovering that Avalon was unlawfully incorporated, owned, and controlled by non-physicians, and therefore ineligible to bill for or collect No-Fault benefits.

206.    Many of these facts—particularly Avalon's unlawful splitting of professional physician fees and profits with Gorshtein, Shusterman, and Akkord—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

207.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

208.    Thus, every time Gorshtein, Shusterman, and DeMarco (along with those individuals working under their control) caused Avalon to submit No-Fault reimbursement demands to Allstate, Gorshtein, Shusterman, and DeMarco (and those individuals working under their control) necessarily certified that Avalon was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

34

209.    The full extent of Gorshtein's, Shusterman's, and DeMarco's fraudulent and unlawful acts relative to their control over the Avalon enterprise—including (a) Gorshtein's and Shusterman's involvement in the operation and control of Avalon, and (b) the unlawful channeling of Avalon's professional proceeds to Gorshtein and Shusterman through the agreements that Akkord maintained with DeMarco and Avalon was not, and could not have been, known to Allstate until it commenced this action.

**C.    ALLSTATE'S JUSTIFIABLE RELIANCE**

210.  Each claim submitted to Allstate by (or on behalf of) Delta and Avalon was verified pursuant to Insurance Law § 403.

211.   At all relevant times, DeMarco, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

212.   To induce Allstate to promptly pay Delta's and Avalon's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or other invoices certifying that Delta and Avalon were eligible to be reimbursed under New York's No-Fault Laws.

213.   Further, to induce Allstate to promptly pay the fraudulent charges for the diagnostic imaging services purportedly provided to patients of Delta and Avalon, the defendants hired law firms to pursue collection of the fraudulent charges from Allstate.  These law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Delta's and Avalon's charges are not promptly paid in full.

214.  Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate in

support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

215.    At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Delta's and Avalon's reimbursement eligibility under New York law.

216.    In reasonable reliance on these misrepresentations, Allstate paid money to Delta and Avalon to its detriment.

217.    Allstate would not have paid these monies had the defendants provided true and accurate information about Delta's and Avalon's reimbursement eligibility under New York law, including the fact and necessity of the services provided.

218.    As a result, Allstate has paid in excess of $2,509,527.00 in reasonable reliance on the defendants' false medical documentation and false representations regarding Delta's and Avalon's eligibility for reimbursement under New York's No-Fault Laws.

## X.    DAMAGES

219.    The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments made in connection with first-party ("No-Fault") claims in excess of $2,509,527.00, the exact amount to be determined at trial.  The tables annexed at Exhibits 5 and 6, and incorporated herein as if set forth in their entirety, identify Allstate's payments to Delta and Avalon in connection with first-party ("No-Fault") claims determined to be fraudulent as of the filing of this Complaint.

XI.   **CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.)**

220.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

221.    Defendants, Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc. (collectively "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

222.    The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart, annexed hereto as Exhibit 3.

223.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

224.    Policies of insurance were delivered to insureds through the U.S. Mail.

225.    Medical reports and invoices were delivered to Allstate through the U.S. Mail.

226.    Payments made by Allstate to Delta Diagnostic Radiology, P.C. traveled via the U.S. Mail.

227.    As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Delta Diagnostic Radiology, P.C. to collect payment

37

from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

228.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Delta Diagnostic Radiology, P.C. for the benefit of the Count I Defendants that it would not otherwise have paid.

229.   The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

230.   The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

231.   By filing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

232.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Delta Diagnostic Radiology, P.C. for the benefit of the Count I Defendants.

233.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

234.   Delta Diagnostic Radiology, P.C. constitutes an enterprise engaged in, and the activities of which affects interstate commerce.

235.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

236.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

237.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

238.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each defendant identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.)**

239.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

240.    Defendants Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc. (collectively "Count II Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Delta Diagnostic Radiology, P.C.

241.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Delta Diagnostic Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in

Exhibit 3, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

242.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Delta Diagnostic Radiology, P.C., even though Delta Diagnostic Radiology, P.C., as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such payments.

243.   The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

244.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of Delta Diagnostic Radiology, P.C. in connection with radiology services that were never actually rendered, or whose results were intentionally manipulated and/or fabricated by the Count II Defendants.

245.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

246.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

40

## COUNT III
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## AVALON RADIOLOGY, P.C. ENTERPRISE
### (Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc.)

247.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

248.   Defendants, Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc. (collectively "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

249.   The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart, annexed hereto as Exhibit 4.

250.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

251.   Policies of insurance were delivered to insureds through the U.S. Mail.

252.   Medical reports and invoices were delivered to Allstate through the U.S. Mail.

253.   Payments made by Allstate to Avalon Radiology, P.C. traveled via the U.S. Mail.

254.   As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Avalon Radiology, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

41

255.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Avalon Radiology, P.C. for the benefit of the Count III Defendants that would not otherwise have been paid.

256.   The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

257.   The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

258.   By filing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

259.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Avalon Radiology, P.C. for the benefit of the Count III Defendants.

260.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

261.   Avalon Radiology, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

262.   The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

263.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

42

264.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

265.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each defendant identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**AVALON RADIOLOGY, P.C. ENTERPRISE**
**(Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc.)**

266.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

267.    Defendants Charles J. DeMarco, M.D., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc. (collectively "Count IV Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Avalon Radiology, P.C.

268.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Avalon Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 4, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

269.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Avalon Radiology, P.C., even though Avalon Radiology, P.C., as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such payments.

43

270.    The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

271.    The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of Avalon Radiology, P.C. in connection with radiology services that were never actually rendered, or whose results were intentionally manipulated and/or fabricated by the Count IV Defendants.

272.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

273.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### AKKORD MANAGING SERVICES, INC. ENTERPRISE
#### (Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C. Edward Gorshtein, and Leonid Shusterman)

274.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

275.    Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C., Edward Gorshtein, and Leonid Shusterman, (collectively "Count V

44

Defendants"), intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

276.    The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts annexed hereto as Exhibit 4.

277.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

278.    Policies of insurance were delivered to insureds through the U.S. Mail.

279.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

280.    As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

281.    The Count V Defendants' use of Akkord Managing Services, Inc. to siphon the professional physician fees and profits from Delta Diagnostic Radiology, P.C. and from Avalon Radiology, P.C. for Gorshtein's and Shusteran's own personal use and financial gain is/was unlawful.

282.    The use of Akkord Managing Services, Inc. also allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., and further permitted Gorshtein and Shusterman to

share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

283.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. for the benefit of the Count V Defendants that would not otherwise have been paid.

284.     The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

285.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

286.     By filing numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

287.     The activities in this case had the direct effect of causing funds to be transferred from Allstate to Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. and then to Akkord Managing Services, Inc. for the benefit of Edward Gorshtein and Leonid Shusterman.

288.     Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

289.     Akkord Managing Services, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

290.    The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

291.    Allstate is a "person" a defined by 18 U.S.C. § 1962(c), injured in its business or property by reason of the Count V Defendants' conduct.

292.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

293.    By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**AKKORD MANAGING SERVICES, INC. ENTERPRISE**
**(Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C.,**
**Edward Gorshtein, and Leonid Shusterman)**

294.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

295.    Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Avalon Radiology, P.C., Edward Gorshtein, and Leonid Shusterman, (collectively "Count VI" Defendants) conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

296.    The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts

47

of mail fraud as set forth in Exhibit 3 and 4, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

297.    The Count VI Defendants' use of Akkord Managing Services, Inc. to funnel professional physician fees and profits from Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to Gorshtein and Shusterman was unlawful, and allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., and further permitted Gorshtein and Shusterman to share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

298.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., even though Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., as a result of the defendants' unlawful conduct, were not eligible to collect such No-Fault payments.

299.    The purpose of this conspiracy was also to cause monies collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to be funneled to Akkord Managing Services, P.C. for the benefit of Edward Gorshtein and Leonid Shusterman.  The funneling of monies to Edward Gorshtein and Leonid Shusterman in this manner was unlawful, and allowed Edward Gorshtein and Leonid Shusterman to exercise some degree of control over the operation and management of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., and further permitted Edward Gorshtein and Leonid Shusterman to share in the professional fees collected by Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

300.    The Count VI Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objections, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

301.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

302.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to collect from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BIG APPLE MANAGING SERVICES, INC. ENTERPRISE**
**(Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and**
**Leonid Shusterman)**

303.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

304.    Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and Leonid Shusterman (collectively "Count VII Defendants"), intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

305.    The Count VII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart annexed hereto as Exhibit 3 and 4.

306.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

307.    Policies of insurance were delivered to insureds through the U.S. Mail.

308.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

309.    As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Delta Diagnostic Radiology, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

310.    The Count VII Defendants' use of Big Apple Managing Services, Inc. to siphon the professional physician fees and profits from Delta Diagnostic Radiology, P.C. for Gorshtein's and Shusterman's own personal use and financial gain is/was unlawful.

311.    The use of Big Apple Managing Services, Inc. also allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C., and further permitted Gorshtein and Shusterman to share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C.

312.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Delta Diagnostic Radiology, P.C. for the benefit of the Count VII Defendants that would not otherwise have been paid.

50

313.    The Count VII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

314.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

315.    By filing numerous fraudulent claims in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

316.    The activities in this case had the direct effect of causing funds to be transferred from Allstate to Delta Diagnostic Radiology, P.C. and then to Big Apple Managing Services, Inc. for the benefit of Edward Gorshtein and Leonid Shusterman.

317.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

318.    Big Apple Managing Services, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

319.    The Count VII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

320.    Allstate is a "person" a defined by 18 U.S.C. § 1962(c), injured in its business or property by reason of the Count VII Defendants' conduct.

321.    The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

322.   By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**BIG APPLE MANAGING SERVICES, INC. ENTERPRISE**
**(Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and
Leonid Shusterman)**

323.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

324.   Defendants Charles J. DeMarco, M.D., Delta Diagnostic Radiology, P.C., Edward Gorshtein, and Leonid Shusterman (collectively "Count VIII" Defendants) conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.

325.   The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Delta Diagnostic Radiology, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 3 and 4, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

326.   The Count VIII Defendants' use of Big Apple Managing Services, Inc. to funnel professional physician fees and profits from Delta Diagnostic Radiology, P.C. to Gorshtein and Shusterman was unlawful, and allowed Gorshtein and Shusterman to exercise control over the operation and management of Delta Diagnostic Radiology, P.C., and further permitted Gorshtein

and Shusterman to share in the professional physician fees and profits collected by Delta Diagnostic Radiology, P.C.

327.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Delta Diagnostic Radiology, P.C., even though Delta Diagnostic Radiology, P.C., as a result of the defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

328.   The purpose of this conspiracy was also to cause monies collected by Delta Diagnostic Radiology, P.C. to be funneled to Big Apple Managing Services, P.C. for the benefit of Gorshtein and Shusterman.  The funneling of monies to Gorshtein and Shusterman in this manner was unlawful, and allowed Gorshtein and Shusterman to exercise some degree of control over the operation and management of Delta Diagnostic Radiology, P.C., and further permitted Gorshtein and Shusterman to share in the professional fees collected by Delta Diagnostic Radiology, P.C.

329.   The Count VIII Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objections, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

330.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

331.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to collect from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IX
### COMMON-LAW FRAUD
### (Against All Defendants)

332.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

333.    The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. each was entitled to receive No-Fault reimbursement under New York law.

334.    The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices, and collection documentation.

335.    The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

336.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.—professional health care entities that were operated and controlled in direct violation of New York law—for payment of No-Fault insurance benefits.

337.    The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

338.    Allstate reasonably relied, it its detriment, upon the defendants' material misrepresentations concerning Delta Diagnostic Radiology, P.C.'s and Avalon Radiology, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for medical expenses pursuant to No-Fault insurance claims.

339.   Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C.—in excess of $2,509,527.00—for health care expenses and services rendered to Allstate claimants, even though Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. were, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT X**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

340.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

341.   When Allstate paid Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C., it reasonably believed that Allstate was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

342.   Allstate's payments constitute a benefit that the defendants aggressively sought and voluntarily accepted.

343.   At all relevant times, the defendants caused Delta Diagnostic Radiology, P.C. and Avalon Radiology, P.C. to wrongfully obtain payments from Allstate—in excess of $2,509,527.00—through their fraudulent billing scheme as described more fully in the paragraphs above.

344.   Retention of these benefits would violate fundamental principles of justice, equity and good conscience.

## COUNT XI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Delta Diagnostic Radiology, P.C.)

345.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

346.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide health care services in New York.

347.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.), and (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Edward Gorshtein, Leonid Shusterman, Big Apple Managing Services, Inc., and Akkord Managing Services, Inc.), Delta Diagnostic Radiology, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional health care services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

348.    Delta Diagnostic Radiology, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

349.    Delta Diagnostic Radiology, P.C. continues to challenge Allstate's prior claim denials.

350.    Delta Diagnostic Radiology, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

351.    A justifiable controversy exists between Allstate and Delta Diagnostic Radiology, P.C. because Delta Diagnostic Radiology, P.C. rejects Allstate's ability to deny such claims.

352.    Allstate has no adequate remedy at law.

353.    Delta Diagnostic Radiology, P.C. will also continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Delta Diagnostic Radiology, P.C.

354.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, §§ 2201 and 2202, declaring that Delta Diagnostic Radiology, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physicians, and (c) engaged in the unlawful sharing of fees derived from the provision of physician services, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Avalon Radiology, P.C.)**

355.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-219 as if fully set forth herein.

356.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide health care services in New York.

357.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc.), and (c) unlawful sharing of professional physician fees with one or more non-physician

(i.e., Edward Gorshtein, Leonid Shusterman, and Akkord Managing Services, Inc.), Avalon Radiology, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional health care services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

358.    Avalon Radiology, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

359.    Avalon Radiology, P.C. continues to challenge Allstate's prior claim denials.

360.    Avalon Radiology, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

361.    A justifiable controversy exists between Allstate and Avalon Radiology, P.C. because Avalon Radiology, P.C. rejects Allstate's ability to deny such claims.

362.    Allstate has no adequate remedy at law.

363.    Avalon Radiology, P.C. will also continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Avalon Radiology, P.C.

364.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, §§ 2201 and 2202, declaring that Avalon Radiology, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physicians, and (c) engaged in the unlawful sharing of fees derived from the provision of physician services, and thus has no standing to submit or receive assigned No-Fault benefits.

XII.   **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company, (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Violations of 18 U.S.C. § 1962(c))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

**COUNT II**
**DELTA DIAGNOSTIC RADIOLOGY, P.C. ENTERPRISE**
**(Violations of 18 U.S.C. § 1962(d))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

**COUNT III**
**AVALON RADIOLOGY, P.C. ENTERPRISE**
**(Violations of 18 U.S.C. § 1962(c))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT IV
### AVALON RADIOLOGY, P.C. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(d))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT V
### AKKORD MANAGING SERVICES, INC. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(c))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT VI
### AKKORD MANAGING SERVICES, INC. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(d))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

## COUNT VII
### BIG APPLE MANAGING SERVICES, INC. ENTERPRISE
### (Violations of 18 U.S.C. § 1962(c))

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

60

(c)     GRANT all other relief this Court deems just and appropriate.

**COUNT VIII**
**BIG APPLE MANAGING SERVICES, INC. ENTERPRISE**
**(Violations of 18 U.S.C. § 1962(d))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and
        attorneys' fees; and

(c)     GRANT all other relief this Court deems just and appropriate.

**COUNT IX**
**(Common-Law Fraud)**

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the
        detection of defendants' illegal conduct; and

(c)     AWARD Allstate its costs in defending No-Fault collection suits filed by defendants
        seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just and appropriate.

**COUNT X**
**(Unjust Enrichment)**

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just and appropriate.

**COUNT XI**
**(Declaratory Relief)**

(a)     DECLARE that Delta Diagnostic Radiology, P.C., at all relevant times, has been
        unlawfully organized, controlled, and/or operated by at least one non-physician, and as a
        result, has been operated in violation of at least one New York State and/or local
        licensing requirement necessary to provide professional medical services in New York;

(b)     DECLARE that Delta Diagnostic Radiology, P.C.'s activities are unlawful;

(c)     DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Delta Diagnostic Radiology, P.C.; and

(d)     GRANT all other relief this Court deems just and appropriate.

## COUNT XII
### (Declaratory Relief)

(a)     DECLARE that Avalon Radiology, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and as a result, has been operated in violation of at least one New York State and/or local licensing requirement necessary to provide professional medical services in New York;

(b)     DECLARE that Avalon Radiology, P.C.'s activities are unlawful;

(c)     DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Avalon Radiology, P.C.; and

(d)     GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury on all claims.


[SIGNATURE PAGE FOLLOWS]

62

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbtink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
Shauna L. Sullivan (SS5624)
ssullivan@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
1325 Franklin Ave., Suite 320
Garden City, NY 11530
(347) 710-0050 (phone)

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company, and Allstate*
*Vehicle & Property Insurance Company*

Dated: August 5, 2015

63

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, ALLSTATE
FIRE & CASUALTY INSURANCE COMPANY, AND
ALLSTATE VEHICLE AND PROPERTY INSURANCE
COMPANY

                                           15-CV-04561 (ERK) (LB)

                           Plaintiff(s)

           -against-                                  AFFIDAVIT

CHARLES J. DEMARCO, M.D.
DELTA DIAGNOSTIC RADIOLOGY, P.C.
AVALON RADIOLOGY, P.C.
EDWARD GORSHTEIN
LEONID SHUSTERMAN
AKKORD MANAGING SERVICES, INC. and
BIG APPLE MANAGING SERVICES, INC.

                               Defendant(s)
_____X

State of New York  )
                  )      S.S.:
County of Kings    )

       Charles Demarco, M.D., being duly sworn, and under an awareness of the
penalties of perjury, deposes and says:

1.      I am the owner of Delta Diagnostic Radiology and Avalon Radiology.

2.      Contrary to the Plaintiffs' complaint, the Hitachi MRP 5000 MRI machine used
by both Delta and Avalon is capable of being serviced and upgraded.

3.      The Service Reports from RAB Maintenance attached to this affidavit are true and
correct copies of the service reports from RAB that I was provided after the upgrades
described in them were performed.

4.      These reports are not being offered as an exhaustive list of all upgrades performed
on the machine since it began being used by Delta and Avalon as they are not the only
upgrades that have been performed on the machine during that time.

5.      Rather, they are being offered only as but a couple of examples of the fact that the contention of the plaintiffs' that the machine is not capable of being upgraded is in

6.      The reports were made in the ordinary course of Plaintiff's business, and were so made at the time the services described in them were performed. It is my regular course of business to make and maintain these documents for my records.

*Charles De Marco*

Charles Demarco, M.D.

NOTARY: The above named individual, known personally to me to be the person named, did swear to the truth of this statement and did sign same before me this _10_ day of _December_, 2015.

*David O'Connor, Esq.*

**DAVID O'CONNOR**
Notary Public, State of New York
No. 02O'C6064635
Qualified in Bronx County
Commission Expires 20 _19, 10/_

# RAB Maintenance, LLC
2980 Hewlett Ave, Merrick, NY 11566
Tel 516 695-8898
## Field Service Report
### Hitachi MRP 5000

Customer Name: _Avalon Radiology PC._
Customer Address: _2025 West 11th Street @@ Brooklyn NY-11223_
Engineer Name: _Bob Leeb_
Start Date: _12/12/2014_ Start Time: _8 00_ Type of Contract _Contract_
System Down? _/_ Scheduled? _yes_ Time System Up _14 00_

**Problem**

_Problem with 1/sp Coil_

**Action**   _Low_

_Scaduled PM Room 1° 682F CF-_
_Adjust Patient positioning System. Clean All filters_
_Checked All fans and Spining. DC offads adjustment_
_On x, y, z Gradients Run RF Gain Adjustment_
_Run. QA on every coil. Checked QD body coil._

**PARTS**

| Part # | QTY | DESCRIPTION | COST |
|--------|-----|-------------|------|
|        |     |             |      |
|        |     |             |      |

| | |
|---|---|
| Labor: | |
| Travel: | |
| Expenses: | |
| Parts: | |
| Tax: | |
| Total: | |

Customer Signature: _Bella Turner_

_# 1564_

# RAB Maintenance, LLC
2980 Hewlett Ave, Merrick, NY 11566
Tel 516 695-8898
### Field Service Report
**Hitachi MRP 5000**

Customer Name: _Avalon Radiology PC._
Customer Address: _2085 West 11th Street Brooklyn NY 11223_
Engineer Name: _Bob Lee_
Start Date: _9/2/2014_   Start Time: _9 Am_   Type of Contract _Contract_
System Down? ___   Scheduled? _Yes_   Time System Up _13:05_

**Problem**

_changed Connector on the Head Coil_
_Adjust Patient Positioning System (Laser)_

**Action**

_Scheduled PM Room 1° 71.7°F  CF-48906_
_Clean All Filters. Chad All fans are spinning Ran FOV_
_on every orientation. Run QA on the System. Clean_
_All Connectors. Ran Gradient gain Adjustment_

## PARTS

| Part # | QTY | DESCRIPTION | COST |
|--------|-----|-------------|------|
|        |     |             |      |
|        |     |             |      |
|        |     |             |      |

| | |
|--------|---|
| Labor: | |
| Travel: | |
| Expenses: | |
| Parts: | |
| Tax: | |
| Total: | |

Customer Signature: _Bella Turner_
_# 1564_

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————————X

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, ALLSTATE
FIRE & CASUALTY INSURANCE COMPANY, AND
ALLSTATE VEHICLE AND PROPERTY INSURANCE          Docket No.: CV No.
COMPANY                                          1: 15- cv-04561-ERK-LB
                          Plaintiffs
                                                 MEMORANDUM & ORDER

        -against-

CHARLES J. DEMARCO, M.D.
DELTA DIAGNOSTIC RADIOLOGY, P.C.
AVALON RADIOLOGY, P.C.
EDWARD GORSHTEIN
LEONID SHUSTERMAN
AKKORD MANAGING SERVICES, INC. and
BIG APPLE MANAGING SERVICES, INC.

                          Defendant(s)

—————————————————————————————X

APPEARANCES
For Defendants:            David O'Connor, Esq.
                           Law Office of David O'Connor, P.C.
                           807 Kings Highway, 2nd Floor
                           Brooklyn, NY 11223

                           Charles Kutner, Esq.
                           Law offices of Charles Kutner, LLP
                           950 Third Avenue, 25th Floor
                           New York, NY 10022
                           (212) 308-0210

For Plaintiffs:            Michael Whitcher, Esq.
                           Smith & Brink, P.C.
                           350 Granite Street, Suite 2303
                           Braintree, MA 02184

Bloom,    Magistrate Judge

        Before the Court is a motion to stay discovery pursuant to F.R.C.P. 26(c) pending

the outcome of the defendants' motion to dismiss the Plaintiffs' complaint pursuant to

F.R.C.P. 12(c). Upon a reading of the papers, it is hereby ORDERED that:

All discovery in the above captioned matter is stayed pending the outcome of the defendants' motion to dismiss.

Plaintiffs shall forthwith notify all parties to whom they have served subpoenas that their compliance with said subpoenas is stayed until further notice by the Court.

Any records already provided pursuant to subpoena shall be kept in sealed condition by the plaintiffs and shall not be reviewed or viewed until further Order by this Court if said Order ultimately permits same.  Plaintiffs shall immediately notify defendants if any documents have been received and said notice shall specify when the documents were received and whether or not the wrapper has been unsealed.

So Ordered

/s/ Lois Bloom
Lois Bloom, U. S. Magistrate

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, ALLSTATE
FIRE & CASUALTY INSURANCE COMPANY, AND
ALLSTATE VEHICLE AND PROPERTY INSURANCE
COMPANY

     -against-

CHARLES J. DEMARCO, M.D.
DELTA DIAGNOSTIC RADIOLOGY, P.C.
AVALON RADIOLOGY, P.C.
EDWARD GORSHTEIN
LEONID SHUSTERMAN
AKKORD MANAGING SERVICES, INC. and
BIG APPLE MANAGING SERVICES, INC.

## Docket No.: CV No. 1: 15- cv-04561-ERK-LB

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE PLAINTIFFS' COMPLAINT PURSUANT TO F.R.C.P. 12(c)

**DAVID O'CONNOR, ESQ**
**Law Office of David O'Connor, P.C.**
**807 Kings Highway**
**Brooklyn, NY 11228**
**(718) 517-2322**